YATES INDUSTRIES, INC. (FORMERLY CIRCUIT FOIL CORPORATION), PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5981–69.    Filed September 20, 1972.

*Philip J. Albert*, for the petitioner
*Albert Squire*, for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioner's income taxes for its taxable years 1963, 1964, and 1965 as follows:

| Taxable year ended | Deficiency |
| --- | --- |
| Feb. 28, 1963 | $31, 761. 47 |
| Feb. 29, 1964 | 30, 244. 44 |
| Feb. 28, 1965 | 24, 639. 65 |

The issue for decision is whether payments made by petitioner to a former officer and stockholder were pursuant to an agreement of purchase and sale of trade secrets entered into in connection with settlement of litigation or represented deductible expenditures made in connection with the settlement of that litigation; and if the amount were paid to purchase trade secrets, did these assets have an ascertainable useful life so as to entitle petitioner to depreciation deductions with respect thereto in the years here in issue.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner is a corporation organized in the State of New Jersey in March of 1955, for the purpose of manufacturing copper foil to be used primarily in printed circuitry. Petitioner originally was named Copper Foil Corp. On February 23, 1960, its name was changed to Circuit Foil Corp., and on May 28, 1970, its name was changed to Yates Industries, Inc. At the time of the filing of the petition in this case, petitioner's principal office was at Bordentown, N.J. Petitioner kept its books of account and filed its income tax returns in accordance with an accrual method of accounting, and for fiscal years ended on the

last day of February. Petitioner's income tax return for its fiscal year 1963 was filed with the district director of internal revenue at Camden, N.J. Petitioner's income tax returns for its fiscal years 1964 and 1965 were filed with the district director of internal revenue at Newark, N.J.

Petitioner was founded by Edward Adler and the late Charles E. Yates. Adler had a Ph. D. in chemistry, physics, and engineering, was an inventor, and had extensive technical and developmental experience with copper foil. Yates had extensive experience in the manufacture of copper foil and was the holder of a number of patents in the copper foil field, most of which in March 1955 were in the public domain.

From its incorporation until May 14, 1959, petitioner had 400 shares of capital stock issued and outstanding. During most of this period Adler and Yates each owned 110 shares, but sometime before May 14, 1959, Adler sold 5 shares and Yates acquired an additional 10 shares. From the time of petitioner's incorporation until May 14, 1959, Adler and Yates were directors of petitioner, and Adler was president and Yates vice president of petitioner.

In April 1955 Adler and Yates entered into 5-year employment agreements with petitioner. On April 12, 1955, Adler and Yates each entered into separate royalty agreements with petitioner, under which they assigned to petitioner all rights and developments concerning the manufacture of copper foil by electrodeposition and any patents and patent applications deriving therefrom, as well as all rights and equipment presently in their possession comprising a pilot plant for producing copper foil.

From 1956 on, purchasers of copper foil for use in printed circuits demanded better and better grades of copper foil. Firms manufacturing copper foil for use in printed circuits, including petitioner, were consequently required to continually improve the quality of their product.

During the period that Adler was the president, director, and one of the two principal stockholders of petitioner, he also was in charge of research and performed whatever other duties were required for petitioner.

In the mid-fifties, purchasers of copper foil for use in printed circuits encountered the problem that the foil would not adhere satisfactorily to plastic laminates. It was apparent that development of adequate printed circuits required some improvements in either the copper foil or in the adhesive technology or both. It was as a result of this need for improved bond strength for petitioner's copper foil that a special treatment for foil, called "Treatment A," was developed. Treatment A was claimed and treated by petitioner as a principal trade secret. In subsequent litigation, which will be discussed more fully,

*infra*, petitioner claimed that all work in the development of Treatment A took place at petitioner's plant whereas Adler claimed that the original idea for Treatment A was conceived by him in his home. Treatment A was used from its inception exclusively by petitioner.

On May 14, 1959, Adler terminated most of his activities and associations with petitioner by entering into a series of four agreements. The first provided for the sale by Adler to petitioner of all his capital stock in petitioner, 105 shares, for the lump sum of $68,000. Upon receipt of the sum of $68,000, Adler agreed to assign his 105 shares to petitioner and to resign as an officer and director of petitioner.

The second agreement (hereinafter referred to as the consulting agreement), dated May 14, 1959, provided for the termination of Adler's existing employment agreement with petitioner and substituting therefor an agreement whereby Adler would act as consultant to petitioner for 2 years at the salary of $600 per month. Adler was not required to work more than 50 days per year in providing this consultation service. Adler also agreed that—

he will not, for a period of seven years from the date of this agreement, directly or indirectly, in any capacity whatsoever, engage in the business of manufacturing or treating copper foil for use in printed circuits in the United States, Canada, Europe or Japan. Both the territorial limitation and the time limitation are conceded by Adler to be fair and reasonable and necessary for protection of Corporation.***

The third agreement dated May 14, 1959, revised Adler's prior royalty agreement with petitioner dated April 12, 1955, as follows:

(1) Petitioner agreed to pay Adler the sum of $40,000 in a lump sum on May 14, 1959, in full payment of the balance owed to Adler under the royalty agreement dated April 12, 1955; and (2) Adler agreed to—

assign and transfer to Corporation [petitioner] all his rights in developments, concerning the manufacture of copper foil by electro-deposition, and any patents and patent applications deriving therefrom, as well as all rights he has or may have in equipment comprising a pilot plant for producing copper foil that was in his possession at the time the above referred to agreement was signed.

The fourth agreement dated May 14, 1959, provided for Adler's continued representation of petitioner in certain negotiations with N.V. Phillips Co. of the Netherlands with reference to utilization of "know-how" of petitioner and the possible erection of a plant for N.V. Phillips Co. If an agreement was reached between petitioner and N.V. Phillips Co., Adler's compensation for his services rendered in bringing about such an agreement would be 13 percent of the money that N.V. Phillips paid to petitioner for the "know-how" or knowledge of manufacturing and treating copper foil.

On April 7, 1960, Adler filed a complaint against petitioner in

the Superior Court of New Jersey, Law Division, Bergen County, in which he alleged that petitioner had failed to pay him his monthly salary of $600 as provided for in the consulting agreement dated May 14, 1959, for the months of February, March, and April 1960, and that the restrictive convenant in the consulting agreement was void as being in violation of public policy and an unreasonable restriction upon his right to engage in a livelihood. Adler sought a declaratory judgment that the consulting agreement had been breached by petitioner and that it was unenforceable and void as and between Adler and petitioner, "and particularly with respect to any restriction as to time or area or activities on the part of said plaintiff, Edward Adler engaging in the business of manufacturing or treating copper foil for use in printed circuits in the United States, Canada, Europe or Japan."

Thereafter, petitioner answered the complaint generally denying its allegations. On June 7, 1960, petitioner filed a counterclaim demanding that Adler be enjoined from using or communicating to others information he had with respect to secret processes for the manufacture and treatment of copper foil, the secret processes being "trade secrets" which were, according to petitioner's counterclaim, owned and developed by petitioner. An injunction was necessary, according to petitioner's counterclaim because:

6. In his capacity as president of defendant corporation [petitioner], plaintiff [Adler] was instrumental in developing, improving and revising some of the processes hereinabove referred to, and personally acquired intimate, detailed knowledge with respect to all such processes.

  *  *  *  *  *  *  *

10. Plaintiff [Adler] now is utilizing his knowledge and information with respect to the aforementioned secret processes belonging to defendant for plaintiff's own benefit and profit, and is about to divulge knowledge in his possession with respect to such secret processes to other persons, businesses and corporations in actual or potential competition with defendant.

On October 6, 1960, an order was entered transferring the Adler suit to the Chancery Division. By court order dated November 4, 1960, Adler was granted leave to file an amended and supplemental complaint against petitioner and its directors. The amended complaint as filed contained six counts.

The first count alleged fraud by the defendants [petitioner and its directors] in connection with the sale by Adler of his stock and the termination of his employment agreement. The second count sought a declaratory judgment as to whether petitioner breached the consulting agreement with Adler dated May 14, 1959. The third count sought a declaratory judgment with respect to the restrictive covenant contained in the consulting agreement of May 14, 1959. The fourth

count sought reformation of the restrictive covenant referred to in the third count. The fifth count sought a declaratory judgment that petitioner had no right, title, or interest in the Treatment A process, and could not use it without Adler's consent, and an accounting for profits resulting from its use after May 14, 1959. The sixth count sought to enjoin petitioner from using certain processes for manufacturing electrodeposited lead foil which Adler claimed was his property.

The defendants, including petitioner, filed their answer to the amended and supplemental complaint. The answer denied generally the allegations of the amended and supplemental complaint and asserted several affirmative defenses thereto.

The suit instituted by Adler against petitioner consumed over 2 years of intensive investigation and preparation for trial and special counsel were hired both on behalf of petitioner and the individual directors. During the course of trial preparation there were at least 42 days of depositions of witnesses. No more than six of these depositions contained significant references to questions involving Treatment A.

In March of 1961 argument was held before Judge Grimshaw of the New Jersey Superior Court, Chancery Division, on Adler's motion for summary judgment on his original complaint that the restrictive covenant was invalid and on petitioner's counterclaim that Adler be enjoined from making any public disclosure, even by way of a patent application, with respect to Treatment A until trial.

On March 31, 1961, the Superior Court denied Adler's motion for summary judgment on the validity of the restrictive covenant and granted petitioner's application for a temporary restraint on Adler by enjoining him from disclosing Treatment A to third parties. This interlocutory order was appealed by Adler to the Appellate Division of the New Jersey Superior Court which affirmed both orders of the trial court but also enjoined petitioner from disclosing Treatment A to third parties, including petitioner's subsidiary in Luxembourg.

The trial of the Adler suit commenced on May 21, 1962, before Judge Schneider in the New Jersey Superior Court, Chancery Division, Bergen County. During the period in which the trial ensued, Yates, the then president and key officer of petitioner and the individual principally responsible for its production, research, and development, was required to be present in court every day. After approximately 10 days of trial, intensive settlement negotiations ensued between petitioner's attorney at the trial and Adler's attorney. As of about June 1, 1962, Adler's attorney was demanding $200,000 in settlement of the case.

On June 1, 1962, petitioner's attorney wrote a letter to petitioner

detailing the litigative probabilities of the case between Adler and petitioner and the estimated costs of continuing the litigation. After summarizing the claims and counterclaims in issue, the letter contained the following conclusions:

(1) we [petitioner] would have less than a fifty-fifty chance of sustaining the validity of the restrictive covenant;

(2) Dr. Adler would *not* succeed on the fraud counts; and

(3) it would be extremely hazardous to predict at all the outcome with respect to Treatment A, and the other inventions with which this litigation is concerned. In this connection, of course, there are three possible results: the court could hold that these inventions, or any of them, are exclusively yours; or find that they belong solely to Dr. Adler, in which case you would of course *immediately* be restrained from employing them in your operations and would be compelled to account to the plaintiff for your past use of them without his consent; or, as a last alternative, the court could hold that they belong to Dr. Adler, but you have shop rights (a non-exclusive irrevocable license) to their use. We do believe that at the very least shop rights to these inventions would be awarded, but in this event, although you would not be liable for any accounting, there is considerable doubt whether your Luxembourg subsidiary would be permitted to share in their use.

Petitioner's attorney estimated that the direct additional expenses which petitioner would incur should the litigation continue, including likely appeals, would be a minimum of $100,000. He noted that the Luxembourg subsidiary would be restrained from using Treatment A until the final decision in the case which it was estimated would be handed down in approximately January 1964. Additionally, Yates and the other officers of petitioner would have to devote their time and energies to the lawsuit, rather than the operation of petitioner. The letter concluded with the statement:

In considering the propriety of any settlement, you must of course assess the practical ramifications of the drain upon your administrative personnel and the additional expenses and uncertainties which continued litigation will entail, particularly if it drags on through trial and appeals until 1964, as now seems likely, and balance these considerations against your ultimate prospects. We do believe, however, that in the light of all the factors discussed above, you would be fully justified in approving a settlement in the total amount of $200,000 along the lines currently being proposed by the other side and now being discussed by respective counsel.

Counsel for petitioner and counsel for Adler were in fact discussing a settlement of the litigation. Adler's counsel agreed that Adler would accept $200,000 in settlement of the litigation but insisted that the settlement agreement had to be framed in terms of Adler's selling and petitioner's purchasing the rights to "Treatment A" and "super anode" so that Adler could be taxed on his gain at capital gain rates. After some discussion petitioner through its counsel agreed to the demands of Adler's counsel that the agreement be worded as a sale and purchase but changed the proposed language as submitted by Adler's attorney to

language to characterize the payments as royalties. Petitioner's counsel informed Adler's counsel that even though he was agreeing to accommodate him as to the form of the agreement being that of purchase and sale with the knowledge that Adler was going to treat the payment as capital gain for income tax purposes, petitioner would not consider itself bound thereby with respect to its treatment of the payments for income tax purposes. Petitioner's counsel framed the payments in terms of royalty payments with the idea of taking into account the reasonably anticipated useful life of "Treatment A" which should ultimately become obsolete. He did this since there could be no settlement effected unless petitioner agreed to Adler's demand that the agreement be one of purchase and sale.

A compromise agreement was settled upon by counsel for Adler and counsel for petitioner, which stated, in pertinent part, as follows:

1. The party of the first part [Adler] hereby sells, assigns, transfers and sets over unto the party of the second part and its successors, and the party of the second part hereby agrees to purchase, and purchases, from the party of the first part, all his right, title and interest, as inventor, in the aforesaid "super anode" and the aforesaid "Treatment A" and his right, title and interest in certain improvements made by him on said "Treatment A", as embodied in an application, Serial #32747, as amended, for United States Letters Patent now pending in the United States Patent Office, together with all claims, demands for damages accrued, or which may accrue on account of any infringement of the said inventions or patent applications.

\* \* \* \* \* \* \*

The party of the second part agrees to pay for the aforementioned sale, assignment and transfer a contingent amount to be determined as follows: the sum of FIFTY THOUSAND DOLLARS ($50,000.00) upon the signing of this agreement, receipt of which hereby is acknowledged, plus a royalty of ten cents (10¢) per pound of copper foil hereafter manufactured by the party of the second part and its subsidiaries and affiliated corporations, *provided, however,* that such royalties shall not be payable with respect to more than five hundred thousand (500,000) pounds of copper foil manufactured in any one calendar year (January 1 to December 31) of the party of the second part, and in no event shall the total royalties payable by the party of the second part to the party of the first part exceed the sum of TWO HUNDRED THOUSAND DOLLARS ($200,000.00), which sum shall include the $50,000 paid to the party of the first part upon execution of this agreement.

The party of the second part covenants and agrees that in all events it shall pay to the party of the first part the royalties due and payable hereunder, \* \* \* in the following amounts at the following times:

| | |
|---|---|
| Mar. 1, 1963 | $25,000 |
| June 1, 1963 | 25,000 |
| Mar. 1, 1964 | 12,500 |
| June 1, 1964 | 12,500 |
| Sept. 1, 1964 | 12,500 |
| Dec. 1, 1964 | 12,500 |
| Mar. 1, 1965 | 25,000 |
| Sept. 1, 1965 | 25,000 |

If at the time of any given aforementioned payment ten cents times the number of pounds of copper foil manufactured by the party of the second part in the calendar year in which said payment is made, less any royalties previously paid during the same calendar year, shall not equal the amount of such payment, nonetheless, such payment shall be made on the date provided as an advance against the royalties to be due and payable to the party of the first part as hereinabove provided.

\*       \*       \*       \*       \*       \*       \*

4. If the party of the second part shall default in the making of any of the payments of the purchase price hereinabove provided in Paragraph 1 of this agreement when due or within forty-five (45) days thereafter, or in the event that the party of the second part becomes insolvent or bankrupt or makes an assignment for the benefit of creditors before the full payment of the royalties afore-mentioned, then and in such event all rights hereby conveyed by the party of the first part in the aforementioned "Treatment A," "super anode," and the aforesaid improvements on said "Treatment A," including any patents obtained thereon, shall, at the option of the party of the first part, be deemed revested in the party of the first part, and the party of the first part shall have and enjoy all rights of ownership thereof. Said reversion of right, title and interest in and to the aforementioned inventions, including any patents obtained thereon, shall be in addition to all other remedies, legal and equitable, available to the party of the first part upon default in payment by the party of the second part under this agreement. In addition, the party of the second part shall convey to the party of the first part such rights as it may have with respect to said inventions.

It is further understood and agreed that in the event of any default by the party of the second part in the making of any of the payments hereinabove provided in Paragraph 1 of this agreement when due or within forty-five (45) days thereafter, or upon the happening of any of the other occurrences hereinabove set forth in this Paragraph 4, the restrictive covenant contained in Paragraph 4 of the consulting agreement between the party of the first part and the party of the second part, dated May 14, 1959, shall be cancelled and be deemed null and void.

\*       \*       \*       \*       \*       \*       \*

7. Within six (6) days after the execution of this agreement, a final judgment, consented to by all the parties hereto, shall be entered in said cause, in the form of Exhibit E annexed hereto. Upon the entry of said judgment, the parties hereto shall exchange general releases, excepting therefrom only the obligations assumed under this agreement.

Exhibit E attached to this agreement contained the same provisions as the judgment later entered in the case.

A special meeting of petitioner's board of directors was held on June 6, 1962, attended by petitioner's directors and its counsel. The minutes of this meeting state in part as follows:

Mr. Yates read to the director [petitioner's attorney's] letter dated June 1, and a copy of same was ordered attached to and made a part of the minutes.

Mr. Yates presented and read to the meeting various documents and agreements providing for termination of the litigation which, he reported had been prepared by counsel as a result of negotiations between the parties since May 31.

After considerable discussion, the following resolution, on motion duly made and seconded, unanimously was adopted:

\*        \*        \*        \*        \*        \*        \*

WHEREAS certain discussions have ensued during the past few days between the corporation and its counsel and Dr. Adler and his counsel with a view towards settling this litigation, as a result of which certain proposed agreements and documents have been drafted, which agreements and documents have been read to the directors at this special meeting;

Now THEREFORE IT IS RESOLVED that the corporation settle the aforementioned litigation on the terms and conditions set forth in the aforementioned agreements and documents; and it is further

RESOLVED that the officers of the corporation be and hereby are authorized and directed to execute the aforementioned documents and agreements in behalf of the corporation \* \* \*

The agreement which counsel for petitioner and counsel for Adler had settled upon, from which we have heretofore quoted in detail, was the document discussed at the special meeting of petitioner's board of directors on June 6, 1962. This agreement was executed shortly after June 6, 1962, by Adler, Yates as president of petitioner, and the four directors of petitioner, including Yates, as individuals. The agreement was back dated to June 1, 1962. The actual date of execution was either June 6 or June 7, 1962.

On June 7, 1962, final judgment was entered by the Superior Court of New Jersey, Chancery Division, Bergen County. This judgment stated in pertinent part as follows:

It appearing that the defendant, Circuit Foil Corporation [petitioner's former name], has by agreement dated June 1, 1962, purchased from the plaintiff [Adler] his right, title and interest, as inventor, in the "super-anode" invention, and in the "Treatment A" invention, and his right, title and interest in the improvements to such "Treatment A" invention made by plaintiff, as embodied in plaintiff's application as amended, for United States Letters Patent pending in the United States Patent Office, and that all the parties have agreed for the settlement and disposition of all the issues in this case by the entry of this consent judgment.

Now, THEREFORE, on the joint motion and consent of all parties herein, it is on this 7th day of June 1962,

ORDERED AND ADJUDGED as follows:

1. That the restrictive covenant contained in paragraph 4 of the Consulting Agreement between the plaintiff and the defendant, Circuit Foil Corporation, dated May 14, 1959 \* \* \* is hereby declared and adjudged to be valid and enforceable.

2. That the defendant, Circuit Foil Corporation is now the owner of the aforesaid "super anode" invention, the aforesaid "Treatment A" invention and the improvements made thereon \* \* \*

\*        \*        \*        \*        \*        \*        \*

5. That except as herein adjudicated, both the amended and supplemental complaint, as amended, and the counterclaim of the defendant, Circuit Foil Corporation filed herein, be and are hereby dismissed with prejudice, but without

costs to any party against any other party, and each party to pay its own costs and counsel fees.

Pursuant to said final judgment and settlement agreement petitioner, during the taxable years involved herein, paid the following amounts to Adler:

| Taxable year ended | Amount |
|---|---|
| Feb. 28, 1963 | $58,333.32 |
| Feb. 29, 1964 | 50,000.00 |
| Feb. 28, 1965 | 50,000.00 |

In early 1961, petitioner sent Charles B. Yates, the son of Charles E. Yates, to Luxembourg to oversee the establishment of a subsidiary corporation of petitioner. The Luxembourg subsidiary was to manufacture copper foil and sell to the European market. This subsidiary did not begin producing copper foil until February 1963 and the first sales were made in May 1963.

Treatment A, a trade secret, was developed in the mid-1950's. In the fall of 1957, petitioner began selling commercial quantities of copper foil which had been treated with Treatment A. By May 1959, the time Adler left the employ of petitioner, one-third to one-half of the output of petitioner's plant was copper foil treated with Treatment A. In the late 1950's a new additive was found which could be used in the treatment process. Adler filed an application for letters patent on this improvement to Treatment A (serial No. 32,747) on May 31, 1960. This patent application was rejected by a patent examiner of the Patent Office on February 2, 1961, was again rejected on October 29, 1962, after an amendment had been filed July 27, 1961, and was rejected for the final time by the Patent Office on October 15, 1963.

Treatment A was beginning to be phased out of use by petitioner in October 1971 and petitioner's president expected petitioner to achieve full conversion to an improved process by 1973.

On its income tax return for the year ended February 28, 1963, petitioner treated $50,533 of its payments to Adler as royalties, which it reported as part of its "Cost of Goods Sold." It treated the balance, $7,800, as royalties, which it deducted from "Other Income" reported on page 1, line 10, of its return. On its income tax returns for the years ended February 29, 1964, and February 28, 1965, petitioner reported its $50,000 payments to Adler as royalties, which it claimed as part of its "Cost of Goods Sold."

Respondent in his notice of deficiency determined that the amounts deducted by petitioner as royalties in the years in issue were amounts paid to acquire title to a secret manufacturing process and as such constituted unallowable, nonamortizable capital expenditures within the purview of section 263 of the Internal Revenue Code.

OPINION

Petitioner's primary contention is that the amounts paid to Adler in settlement of the litigation between them are deductible as ordinary and necessary business expenses since the settlement was entered into to save further expense of the litigation to petitioner. Respondent contends that the payments to Adler by petitioner represent the purchase price of trade secrets, the useful life of which was greater than 1 year but was not reasonably ascertainable. Accordingly, respondent contends that petitioner is not entitled to deduct any amount of the payments as business expenses or as depreciation allowances on these trade secrets. Sec. 1.167 (a)–3, Income Tax Regs.[1]

Petitioner asserts that prior to the date of the settlement agreement, it possessed all substantial rights to the trade secrets and therefore could not have paid out the money to Adler to acquire title to property it already owned. Petitioner asserts that its primary purpose in paying the money to Adler was not to acquire property rights in the trade secrets from Adler but was to allow Yates and the other officers of petitioner to devote their time and energy to the manufacturing operations at petitioner's plant and not to the lawsuit, and also to enable the Luxembourg subsidiary of petitioner to use Treatment A in its manufacturing operations.

The motive or purpose of a taxpayer in making a payment in settlement of litigation has been considered in some cases in determining for what a payment was made but has no application except in those cases which involve costs incurred in connection with litigation that may affect a taxpayer's title to property more or less indirectly and call for a judgment whether the taxpayer can fairly be said to be "defending or perfecting title." *Woodward* v. *Commissioner*, 397 U.S. 572, 575 (1970), affirming 410 F. 2d 313 (C.A. 8, 1969), which affirmed 49 T.C. 377 (1968). In *Anchor Coupling Co.* v. *United States*, 427 F. 2d 429 (C.A. 7, 1970), the court after discussing the Supreme Court's holding in the *Woodward* case and in *United States* v. *Gilmore*, 372 U.S. 39 (1963), stated:

Accordingly, we hold that the origin and character of the claim *with respect to which a settlement is made*, rather than its potential consequences on the business operations of a taxpayer is the controlling test of whether a *settlement*

---

[1] Sec. 1.167 (a)–3, Income Tax Regs., states in part:

If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. * * *

*payment* constitutes a deductible expense or a nondeductible capital outlay. [Emphasis supplied. 427 F. 2d at 433.]

See also *Stass Reed*, 55 T.C. 32 (1970).

We therefore must first determine in this case "In lieu of what were the amounts paid under the settlement agreement received?" *Raytheon Production Corp.*, 1 T.C. 952, 958 (1943), affd. 144 F. 2d 110 (C.A. 1, 1944); *Estate of Mabel K. Carter*, 35 T.C. 326, 332 (1960), affd. 298 F. 2d 192 (C.A. 8, 1962), certiorari denied 370 U.S. 910 (1962). Petitioner contends that if we do not accept its contention that the entire payment is deductible because of the primary purpose of the settlement being to facilitate its business operation, we should conclude that the $200,000 was a lump-sum payment to dispose of all the claims and contentions made in the litigation between petitioner and Adler. Petitioner states that adopting this view the payment was made to require Adler to comply with the noncompete agreement, to obtain clear right to the trade secrets, and to have the fraud and breach-of-contract issues dismissed with prejudice.

Petitioner contends that the major portion of the payment should be allocated to the noncompete agreement which had only 4 years remaining to run and that the trade secrets should be considered to have a useful life coincident with the expiration of that agreement. On this basis petitioner argues that it should be allowed the full amount of the deductions claimed for payments under the settlement agreement.

Respondent takes the simple position that in accordance with the agreement of June 1, 1962, the entire $200,000 was paid for trade secrets which respondent contends had no reasonably ascertainable useful life. In *Commissioner* v. *Danielson*, 378 F. 2d 771, 777 (C.A. 3, 1967), remanding 44 T.C. 549, the Court of Appeals to which an appeal in this case would lie held that when a contract for purchase and sale of all the stock of a corporation contained a noncompete agreement with the selling shareholders and an allocation of the purchase price between the price of the stock and the agreement was made in the contract, "absent a showing of fraud, undue influence and the like on the part of the other party" the taxpayer may not challenge the allocation for tax purposes. Petitioner does not contend that the same rule which is applicable to a bargained-for sale of a business should not be applicable to a bargained-for settlement of a law suit but rather argues that the *Danielson* case has no applicability to a case involving a lump-sum payment to dispose of a number of items or claims. The facts here presented do not support petitioner's position that the $200,000 was a "lump sum" to settle a number of claims. The June 1, 1962, agreement specifically provided that the

$200,000 was the purchase price of the trade secrets. Therefore the logical interpretation of the agreement is that no amount was paid for the sustaining of Adler's noncompete covenant or that this was compensated for by the dismissal with prejudice of all other claims. The agreement included a provision for entry of a judgment providing for such dismissal.

However, even if the June 1, 1962, agreement were less precise, upon a consideration of all the evidence in this record it is clear that the parties to the June 1, 1962, agreement intended the $200,000 to be for the purchase of the trade secrets.

*Delsea Drive-In Theatres, Inc.* v. *Commissioner*, 379 F. 2d 316, 317 (C.A. 3, 1967), affirming a Memorandum Opinion of this Court, contains the following statement with respect to a contract containing no allocation to a noncompete agreement:

The Tax Court concluded that the petitioner did not intend to allocate any portion of the $175,000 to the agreement not to compete and was thus not entitled to the deductions. The Court reached this conclusion from the absence of any mention of the agreement not to compete in the stock purchase agreement and from the lack of any stated monetary consideration in the agreement not to compete. Since the absence of such facts from the record is not conclusive, United Finance and Thrift Corp., 31 T.C. 278, aff'd 282 F. 2d 919, 922 (4 Cir.), cert. denied 366 U.S. 902, 81 S. Ct. 1045, 6 L. Ed. 2d 202 (1960), the Tax Court examined the record as a whole and found nothing inconsistent with its conclusion. As it points out in its opinion, although the parties may have considered the agreement not to compete to be valuable, " 'If the parties did not intend that a part of the purchase price be allocated to *** [an] important and valuable covenant, that intention must be respected.' Anabelle [Annabelle] Candy Co. v. Commissioner, 314 F. 2d 1 [7] (9 Cir. 1962)."

Here the record affirmatively shows that Adler refused to enter into the settlement unless the entire $200,000 was paid as the purchase price of the trade secrets. Petitioner only consented to enter into such an agreement since Adler refused to settle the case on any other basis. The record here is clear that the agreement between the parties was that the entire $200,000 was the purchase price of trade secrets. Petitioner used the royalty wording with the idea that possibly the payments could be amortized over a relatively short useful life for the trade secrets.

Petitioner contends that it should be allowed to amortize the cost of the trade secrets and patent applications over a 4-year period which includes the years here in issue relying on *Associated Patentees, Inc.*, 4 T.C. 979 (1945). That case involved payments in an amount which could not be determined until a later year as the purchase price of a patent with a fixed useful life. The issue was the reasonable amount of depreciation to be allowed in the year there in issue since the cost of the patent could not in that year be precisely determined. The

present case involves trade secrets. A trade secret generally has no ascertainable useful life unless such a useful life may be fixed relative to some particular circumstance. The evidence here totally fails to show that Treatment A or the super anode had a useful life that could be estimated with reasonable accuracy. There is no showing that the useful life of these trade secrets would end with the end of the noncompete covenant 4 years after the date of the settlement. In fact such evidence as is in the record indicates that the trade secrets had a useful life far in excess of 4 years.

Petitioner also claims that it suffered a loss when the Patent Office issued a final rejection in October 1963 on the patent application acquired from Adler as a result of the settlement agreement dated June 1, 1962. Petitioner has totally failed to show that this application had any value independent of the trade secrets petitioner acquired. The indication from the record is that it did not. The patent application concerned a new additive to be used in the Treatment A process. Petitioner had the process, apparently, including the new additive as a trade secret indefinitely. The evidence is insufficient to establish a loss upon the rejection of the patent application.

On the basis of this record, we conclude that petitioner is not entitled to deduct as depreciation allowances during the years in issue any portion of the amounts it paid to Adler representing the purchase price of the trade secrets and patent application. We hold for respondent on the only issue presented for our decision. Respondent on brief asks that because of certain adjustments not here in issue, decision be entered under Rule 50.

*Decision will be entered under Rule 50.*