ARTHUR L. SIGMAN and VIVIENNE J. SIGMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sigman v. Commissioner
Docket No. 3834-71.
United States Tax Court
T.C. Memo 1972-256; 1972 Tax Ct. Memo LEXIS 1; 31 T.C.M. (CCH) 1275; T.C.M. (RIA) 72256; December 29, 1972, Filed *1 As a result of extensive, arm's-length negotiations, the parties to a stock redemption agreed that no amount of the consideration paid for the stock was allocable to a noncompete covenant given by petitioner whose stock was being redeemed. Accordingly, the written agreement signed by the parties contained no allocation. Held, the bona fide terms of the stock redemption should be respected; respondent may not allocate a portion of the stock price to the covenant in light of the parties' clear intention that no allocation be made. Held, further, that petitioner has not adduced sufficient proof that legal fees paid in defending against a suit were incurred in the carrying on of a trade or business. John S. Castellano and Claude M. Maer, Jr., for the petitioners. Charles H. Cowley, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the taxable year ending January 31, 1968, in the amount of $38,512.26. The two issues presented for decision are as follows: (1) Whether part of the consideration received by petitioner Arthur L. Sigman under an agreement for the redemption of *2 his stock Sigman Meat Company, Inc., is allocable to a covenant not to compete and taxable as ordinary income under section 61(a)(1). [1]
(2) Whether legal expenses incurred in defending against a suit to collect on a note signed by petitioners are deductible under section 162(a). FINDINGS OF FACT General. The petitioners, Arthur L. Sigman and Vivienne J. Sigman, are husband and wife, and they resided in Englewood, Colorado, at the time their petition was filed with this Court. They filed their joint Federal income tax return for the taxable year ending January 31, 1968, with the district director of internal revenue, Denver, Colorado. Arthur L. Sigman will be referred to herein as petitioner. In the notice of deficiency, the Commissioner based his determination upon the following adjustments: (1) that $75,000 of the total proceeds received by petitioner upon the sale of his stock interest in Sigman Meat Company, Inc. (hereinafter referred to as Sigman Meat or the corporation), was taxable as ordinary income, and (2) that $3,103.63 incurred as legal fees in defending a suit on a *3 note was deductible as a capital loss rather than as a trade or business expense. Issue 1. The covenant not to compete. Petitioner was one of the founders in 1938 of a business operated during the period here in controversy by Sigman Meat. He served as president and general manager of the corporation from 1946, the year of its orgainzation, until 1967, the year petitioner's interest in the corporation's stock was redeemed. As general manager, petitioner's responsibilities encompassed setting sales goals and dealing with the sales force through the sales manager, establishing production and inventory levels, and providing marketing expertise. The business of Sigman Meat included the slaughter and processing of beef, the sale of fresh pork, and the sale and manufacture of processed pork items, including such products as bologna, frankfurters, sliced luncheon meats, and sausage. There were no trade secrets utilized in the corporation's production; the ingredients and processes used by Sigman Meat were generally common knowledge throughout the sausage and processed meat industry. However, Sigman Meat's employees had recognized sales and management abilities and technical skills. From 1946 *4 through 1967, the corporation marketed its products under several trademarks or trade names, one of which--Mile High--was a registered trademark owned by the corporation. Although not included in the registered trademark, the name Sigman appears on all the packages of the products sold by the corporation. During 1960, the corporation expanded its operations and petitioner sought additional capital to cover overruns on the budgeted costs of the expension. The funds were obtained at that time by selling stock in Sigman Meat and in Continental Leasing Company, a related corporation (hereinafter referred to as Continental), to George and Irvin Weisbart, who thereby entered the processed meat business for the first time. The Weisbarts acquired stock ownership in both corporations equal to that owned by petitioner. The Weisbarts expanded the corporations' credit, guaranteed and made loans to the corporations, and guaranteed and made personal loans to petitioner. The guarantees were periodically renewable. Although Sigman Meat enjoyed substantial overall profits and growth from 1960 through 1964, the corporation suffered losses in 1965 and 1966, and petitioner and the Weisbarts experienced *5 sharp differences of opinion over how the corporation should be managed. In 1965, the Weisbarts suggested that petitioner or another purchaser buy out their interests in Sigman Meat, Continental, and other related corporations. [2] Around the beginning of 1967, friction between the Weisbarts and petitioner culminated in petitioner's being replaced as general manager. Although petitioner resigned and appointed his successor, he did so under a threat that the Weisbarts' guarantees *6 on loans to the corporation and petitioner would not be forthcoming. Withdrwal of the guarantees would have resulted in a calling of the loans and an immediate reduction in the corporation's capital and operations. After approximately 1-1/2 years of exhaustive, futile efforts to sell the entire corporation or the Weisbarts' interest, the Weisbarts informed petitioner that they would consider buying his stock, but that a covenant not to compete would be essential to any stock-purchase agreement. Thereafter, starting on February 20, 1967, meetings were held between petitioner, Irvin Weisbart, Gilbert Goldstein (the attorney for the Weisbarts and Sigman Meat), and Sam Butler (the accountant for Sigman Meat), for the purpose of negotiating an agreement whereby petitioner's stock in the corporation would be redeemed. [3] Although at least three meetings were held during the period February 20 through March 16, 1967, no agreement was reached as to either the value of petitioner's stock or whether a specific dollar amount would *7 be allocated to the covenant not to compete. Then, sometime between March 16 and April 13, 1967, a fourth meeting was held between the above-mentioned parties in Goldstein's offices. After some bargaining, an offer was extended to petitioner to redeem his stock in Sigman Meat and Continental for $700,000, plus a meat processing plant located in Butte, Montana, plus $75,000 for a 5-year covenant not to compete. Petitioner considered this a favorable offer but requested that the form of the redemption be recast to permit him to purchase the Montana property. Accordingly, the total consideration in cash and notes in the redemption transaction was increased from $775,000 to $850,000 on the condition that petitioner purchase the Montana Property for $75,000. Both the purchase and the redemption would occur simultaneously and the sole consideration paid for the Montana property would be petitioner's personal note secured by one of the notes received from the corporation. There was also considerable discussion at this meeting over what exactly was to be included in the covenant not to compete, but its tax consequences were not discussed. Petitioner orally stated his general agreement to the *8 terms of the modified offer. However, as had been his past practice, petitioner wanted to discuss the matter with his accountant and attorney before signing a final, detailed, written agreement. Upon being advised by his accountant that he would be taxable at ordinary rates on any amount of the stock-purchase price allocated to the covenant not to compete, petitioner told Goldstein that he would not sign an agreement containing such an allocation. Goldstein consulted with Irvin Weisbart and Butler and then responded that a price of $850,000, with no allocation to the covenant, was acceptable to them. Later, at a May 11, 1967, meeting, this same agreement that no part of the redemption price would be allocated to the covenant was reiterated in conversations between petitioner's accountant and Goldstein. Negotiations as to the other terms of the agreement continued. Goldstein thereafter made three drafts of the redemption agreement. None of the drafts contains an allocation of any part of the purchase price to the covenant. The third draft ultimately became the agreement signed on June 13, 1967, by the parties--Sigman Meat, petitioner, George Weisbart, and Irvin Weisbart. [4] The changes *9 made in the first two drafts primarily liberalized the terms of the covenant not to compete, in effect permitting petitioner to engage in more meat-related businesses other than the production of sausage items. Also, sometime between the first and second drafts, the original agreement was modified to provide that insurance policies upon the life of petitioner which were owned by the corporation would be assigned to him. The cash value of the policies was $12,132.28, and although paragraph 2 of the final agreement recites the sum of $850,000 as payable to petitioner for his stock, the actual consideration received included the value of the insurance and totaled $862,132.28. The $850,000 purchase price was to be paid in the form of *10 cash of $65,000 and five notes for the balance. The notes were to bear interest at the rate of 6-1/2 percent, but the interest was to be adjusted semiannually so that the rate would be 1 percent above the prime rate then being charged by The First National Bank of Denver. The agreement does not condition the notes on petitioner's performance of the noncompete covenant. In addition to the terms discussed above, paragraph 13 of the redemption agreement provided: The Retiring Stockholder gives and grants to the Corporation all of the rights which the Retiring Stockholder has to continue to solely and exclusively do business under its present corporate name as well as to continue to use all trade names, trademarks and identifying symbols presently or heretofore used by the Corporation or by any subsidiary thereof. Said Retiring Stockholder further agrees not to use the name "Sigman" at any time hereafter in any business which is in competition with the business of the Corporation or any of its subsidiaries. Paragraph 14 [5] *12 contains the covenant in which petitioner agrees not to compete with the corporation for a period of 5 years from the closing date of the agreement within a specified *11 7-State area where the corporation's products were being sold. There was no allocation in the redemption agreement of any part of the consideration paid for the stock to the covenant not to compete. Effective at the time the agreement was executed, of Sigman Meat and related corporations. In the fall of petitioner resigned as an officer, director, and employee 1967, petitioner began operating the Silver State Beef Company, a small beef-packing *13 concern. On July 15, 1967, Albert Miltenberger, an associate of petitioner since 1938 and vice president in charge of production at Sigman Meat, had his stock in Sigman Meat and Continental redeemed on substantially the same basis as petitioner's redemption. [6] *14 Miltenberger had been responsible for the development of most of the sausage and processed ham products marketed by Sigman Meat, and although there were no trade secrets involved in the production of such items, Miltenberger was considered by the Weisbarts to be a very knowledgeable person and a potentially dangerous competittor. The Weisbarts asked Miltenberger to sign a noncompete agreement, but Miltenberger refused. Subsequent to the termination of his relationship with the corporation, Miltenberger purchased a one-half interest in the Loveland Packing Company which produces and sells the same types of items sold by Sigman Meat. Issue 2. Legal fees. In 1960, petitioner was a joint venturer or partner in an organization known as the Viking Equipment Company (hereinafter Viking), which was a joint venture or partnership rather than an incorporated entity. On May 27, 1960, petitioner, along with the other partners, executed a promissory note on behalf of Viking and individually in the principal amount of $75,000, payable to the Jefferson County Bank of Lakewood in Lakewood, Colorado (hereinafter the bank). The loan proceeds were to be used to (1) purchase an oil run from the Viking oil Company, an unrelated corporation with which petitioner and the partnership had no connection, and (2) retire some oil equipment loans so that the equipment could be used to operate the oil run. The revenue from the oil run was to have been applied to retire the note. When the note was paid, petitioner was to be deeded a one-sixteenth interest in the oil run as consideration *15 for the loan. Unbeknownst to petitioner, the proceeds of the loan were diverted from their intended purposes and deposited in the account of the Viking Oil Company. Because the oil run revenues from which the payments on the note were to be made were never forthcoming, the bank brought suit against the signatories to the note, including petitioner, individually and jointly under the name Viking Equipment Company, first upon a forged renewal note dated August 27, 1960, and subsequently upon the original note. [7]During the taxable year ending January 31, 1968, petitioner incurred $3,103.63 in legal expenses defending against the aforementioned suits and deducted this amount in his tax return for that year. ULTIMATE FINDINGS OF FACT At the time the June 13, 1967, agreement providing for the redemption of petitioner's Sigman Meat stock was signed, the parties intended that *16 there be no allocation of any part of the purchase price to the noncompete covenant given by petitioner. The record does not show that petitioner's out6ay of legal fees in connection with the suit brought against him by the bank was an ordinary and necessary expense incurred in the carrying on of a trade or business. OPINION Issue 1. The covenant not to compete. If $75,000 of the consideration received by petitioner for his Sigman Meat stock is allocable to his covenant not to compete, he is taxable on that amount as ordinary income under section 61(a)(1). Compensation for refraining from the performance of services is clearly ordinary income. On the other hand, if no part of the $862,132.28 in cash, insurance, and notes received for the stock is properly allocable to the noncompete covenant, the entire amount of petitioner's gain is taxable as capital gain under sections 302, 1222, and related provisions. The redemption agreement does not allocate to the noncompete covenant any part of the amount received by petitioner as consideration for the surrender of his stock. However, respondent argues that he may look at the "realities" of the transaction and determine its tax consequences *17 despite the form in which it is cast. Having determined that $75,000 of the total consideration received by petitioner for his stock was ordinary income, respondent urges that petitioner has the burden of proving that this amount was not received for the noncompete covenant. We recognize that respondent's concern in this case, as in other covenant-not-to-compete situations, is to enforce the revenue laws and to avoid a "whipsaw," i.e., allowance of both petitioner's claim to capital gain treatment of the entire redemption price and Sigman Meat's claim to amortization deductions under section 167 for part of the purchase price. See Commissioner v. Gazette Tel. Co., 209 F. 2d 926 (C.A. 10, 1954). Unfortunately, both parties to the transaction are not before the Court. But much of the testimony came from Irvin Weisbart, Sigman Meat's attorney, and its accountant, all of whom participated in the negotiations. Considering the record as a whole, we think petitioner has carried his burden of proving that the parties, at the time they signed the redemption agreement, intended not to allocate any part of the purchase price to the covenant not to compete. The realities are that the negotiations *18 which led to the redemption agreement were vigorous and protracted. The parties bargained over the redemption price of the stock, the terms of the covenant, and whether to allocate any portion of the redemption price to the covenant. When the parties finally signed the agreement that had been drafted by the Weisbarts' attorney, they did so with a sharp understanding of its substance and content. Cf. Hamlin's Trust v. Commissioner, 209 F. 2d 761, 765 (C.A. 10, 1954). In the course of these negotiations, the Weisbarts tried to get petitioner to agree to an allocation of part of the redemption price to the noncompete covenant, but he refused to do so. In the early stages of the negotiations, the parties discussed a provision allocating $50,000 to $75,000 to the covenant. However, when petitioner learned of the tax consequences of such an allocation, he adamantly refused to agree to any such provision. Ultimately the Weisbarts acceded to petitioner's demand that none of the consideration be allocated to the covenant. The above and other factors support our Finding that the parties did not intend to allocate any portion of the purchase price to the covenant. The price paid Miltenberger *19 for his Sigman Meat stock in the month following the execution of the redemption agreement was approximately the same amount per share as petitioner received, and Miltenberger, though requested to do so, gave no covenant not to compete. Moreover, the deferred payments to petitioner evidenced by promissory notes all bore interest; it seems improbable that Sigman Meat would pay interest on an obligation if incurred for a continuing covenant. Finally, if part of the stated redemption price was, in fact, allocable to the covenant, the corporation most likely would have protected itself from violation of the covenant by spreading the payments over the 5-year period or conditioning its obligation in some way; yet it did not do so. We think this genuine agreement of the parties should be respected. It was hammered out through arm's-length negotiations, and it reflects their true intent. [8] *20 It is not a collusive arrangement. To allocate part of the redemption price to the noncompete covenant in this proceeding would be tantamount to setting aside a bona fide contract and substituting a revised version which petitioner expressly rejected. The following words of the Court of Appeals in Delsea Drive-In Theatres, Inc. v. Commissioner, 379 F. 2d 316, 317 (C.A. 3, 1967), affirming per curiam a Memorandum Opinion of this Court, are apposite: The Tax Court concluded that the petitioner did not intend to allocate any portion of the $175,000 to the agreement not to compete and was thus not entitled to the deductions. The Court reached this conclusion from the absence of any mention of the agreement not to compete in the stock purchase agreement and from the lack of any stated monetary consideration in the agreement not to compete. Since the absence of such facts from the record is not conclusive, United Finance and Thrift Corp., 31 T.C. 278, aff'd 282 F. 2d 919, 922 (4 Cir.), cert. denied 366 U.S. 902, 81 S. Ct. 1045, 6 L.Ed.2d 202 (1960), the Tax Court examined the record as a whole and found nothing inconsistent with its conclusion. As it points out in its opinion, although the parties may have considered the agreement not to compete to be valuable, "'if the parties did not intend that a part of the purchase price be allocated *21 to * * * [an] important and valuable covenant, that intention must be respected. ' Anablle [Annabelle] Candy co. v. Commissioner, 314 F. 2d 1 [7] (9 Cir. 1962)." See also Annabelle Candy Co. v. Commissioner, 314 F. 2d 1, 7 (C.A. 9, 1962), [9] affirming a Memorandum Opinion of this Court; Rinehart Oil News Co., T.C. Memo. 1965-178, affirmed per curiam 369 F. 2d 692 (C.A. 5, 1966); and Yates Industries, Inc., 58 T.C. 961 (1972). We emphasize that we are not here dealing with a factual situation where the parties have adopted collusively an agreement lacking economic reality and designed merely to serve their best interests tax-wise. The thrust of the disputed covenant (paragraph 14 of *22 the redemption agreement, quoted in footnote 5, supra) was to prohibit petitioner from manufacturing or selling sausage products which historically have been the most profitable commodity of Sigman Meat. Since the inception of the business, the corporation has sold these sausage products under trade names which include the name Sigman. In paragraph 13, petitioner agreed not to use his name in any business in competition with Sigman Meat. Both paragraphs were incorporated into the agreement for the same purpose: to protect the all-important goodwill retained by Sigman Meat after petitioner severed his interest in the corporation. To the extent these valuable rights were reflected in the purchase price of the stock, we think it comports with economic reality to equate their tax treatment with that of a transfer of goodwill. Cf. Wilson Athletic G. Mfg. Co. v. Commissioner, 222 F. 2d 355 (C.A. 7, 1955). On this issue, we hold for petitioner. [10] Issue *23 2. Legal fees. The issue framed by the pleadings and briefs is a narrow one. Respondent has determined that the legal fees paid by petitioner are deductible as a capital loss. Petitioner contends only that the outlays were ordinary and necessary expenses paid or incurred in the operation of a trade or business within the meaning of section 162(a). [11] *24 The evidence on this issue is so sparse that we are unable to make a finding that petitioner incurred the legal expenses in a trade or business. We do not know, for example, any of the provisions of the Viking joint venture agreement or the terms of the loan. It appears the joint venture was intended to do nothing except facilitate the solitary transaction of securing the loan so that petitioner and his associates could acquire the oil runs for themselves. [12] The meager evidence available compels us to hold that petitioner has failed to carry his burden of proving respondent's determination incorrect. To reflect the foregoing, Decision will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue.↩
2. For purposes of finding a third-party purchaser, one of the Weisbarts made petitioner an offer to sell his stock, effective until February 1, 1965, for $625,000. Later, an "Option Agreement" was signed by both George and Irvin Weisbart, effective until July 15, 1965, in which their stock was offered for 1,100,000 subject to the conditions that the Weisbarts be released from their guarantees and repaid their loans made to the Sigman Meat Company, Inc., and related corporations. While searching for prospective purchasers, petitioner had valued the stock of Sigman Meat and Continental Leasing Company at $2,250,000 and estimated that it would take an additional $2,500,000 to remove the indebtedness owing to the Weisbarts.↩
3. Weisbart, Goldstein, and Butler had had several meetings prior to February 20, 1967, for the purpose of determining an initial offering price for petitioner's stock.↩
4. On June 13, 1967, the stock ownerships of SigmanMeat Company, Inc., and Continental Leasing Company were as follows: Sigman Meat Company, Inc.
Stock Ownership
Shares
Percentage
Class A
Class B
of Ownership
A. L. Sigman
196
36.75
47.5
Weisbart interests
196
36.75
47.5
A. J. Miltenberger
24.50
5.0 392
98.00
100.0
↩
Continental Leasing Company
Stock Ownership
Percentage
Shares
of Ownership
A. L. Sigman
51
37.5
Weisbart interests
51
37.5
A. J. Miltenberger
29
21.3
Other interests 5
3.7 136
100.0
5. Paragraph 14, in relevant part, provides: As further consideration for the payment of the sums hereinabove provided, the Retiring Stockholder covenants and agrees that for a period of five (5) years from the closing date hereof, within the geographical area in which the Corporation's products are now being sold (for this purpose defined as the states of Colorado, Idaho, Wyoming, Montana, Oregon, Nebraska and New Mexico) he will not act for himself or on behalf of any other person or corporation or through any other person, entity or corporation directly or indirectly as proprietor, employee, associate, officer, partner, manager, agent, or otherwise by means of any corporate or legal devise (1) fabricate or sell any packaged sausage products, including but not limited to those now being fabricated or sold by the Corporation, (2) engage in any business or render any services such as have been heretofore engaged in, participated in, performed or rendered by the Corporation, or compete with the Corporation's present operations in any fashion whatsoever, except that he may: a) Buy, sell and feed livestock of any specie; b) Slaughter, break, bone and fabricate and sell beef, veal, lamb including by-products and processed products therefrom. This exception shall not include the fabrication or sale of packaged sausage products of any kind (whether fresh, cured or smoked); c) Can, in rigid or semi-rigid containers of metal, paper, plastic or glass - cured, smoked or salted pork, beef, veal or lamb products or combinations thereof, but not including fresh, cured, or smoked sausage products; d) Engage in the rendering business; e) Engage in the hide business. * * * The parties agree that upon any breach of this covenant, because of the difficulty of ascertaining damages, an action may be instituted in any court of competent jurisdiction for relief in the nature of a restraining order or injunction to cause the termination of said breach.↩
6. Miltenberger received $80,000 for his 24.5 shares (5-percent interest) in Sigman Meat and $50,000 for his 29 shares (21.3-peroent interest) in Continental. Petitioner owned a 47.5-percent interest in Sigman Meat and a 37.5-percent interest in Continental for which he received a lump-sum recited consideration of $850,000. However, Miltenberger was not assigned any life insurance policies and the difference in the proportionate value of the consideration received by each retiring shareholder is due primarily to the cash value of the insurance policies received by petitioner.
7. The decisions relating to the first and second legal actions are reported in Luby v. Jefferson County Bank of Lakewood, 389 P.2d 190, 154 Colo. 160 (1964), and Luby v. v. Jefferson County Bank of Lakewood, 476 P.2d 292↩, 28 Colo. Ct. App. 441 (1970), respectively. Judgment was ultimately granted in favor of the bank.
8. To be distinguished is the factual situation in which the parties cannot agree on the amount to be allocated. See Harry A. Kinney, 58 T.C. 1038↩ (1972).
9. The rule which we have here stated accords with the Commissioner's position, quoted at length in Annabelle Candy Co. v. Commissioner, 314 F. 2d 1, 5 (C.A. 9, 1962), in part, as follows: "We do not contend that the presence or absence of an express dollar allocation to the covenant not to compete is a controlling test per se. What we contend is that the evidence must show that the parties treated the covenant as a separate item for which consideration was paid. * * * " (Emphasis the Commissioner's.)↩
10. Having concluded that no part of the redemption price may be allocated to the covenant not to compete, we do not reach petitioner's alternative contention that any amount allocated to the covenant should be spread over the 5-year period.↩
11. Petitioner does not contend, for example, that the diversion of the funds to the Viking Oil Company was a casualty or theft loss within the meaning of sec. 165(c)(3) and that the legal fees were incidental thereto, or that the legal fees were losses incurred in a transaction entered into for profit under sec. 165(c)(2). 12. The parties stipulated that petitioner "was a partner or joint venturer in a business known as Viking Equipment Co.," but we do not understand, and petitioner's brief does not suggest, that this stipulation was intended to establish that petitioner or the joint venture was engaged in the conduct of a "trade or business" within the meaning of sec. 162(a).↩