HARRY A. KINNEY AND BETTY W. KINNEY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2935–68. Filed September 26, 1972.

*Charles W. Hall* and *Augustus T. Blackshear, Jr.*, for the petitioners.

*Leslie A. Plattner*, for the respondent.

SIMPSON, *Judge:* The respondent determined a deficiency of $49,200.34 in the petitioners' 1962 Federal income tax. The only issue for decision is what portion, if any, of the amount paid for an insurance agency is allocable to the covenant not to compete.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, Harry A. and Betty W. Kinney, are husband and wife and maintained their residence in Houston, Tex., at the time the petition was filed in this case. They filed their 1962 joint Federal income tax return with the district director of internal revenue, Austin, Tex. Mr. Kinney will sometimes be referred to as the petitioner.

For over 20 years prior to March 1962, Mr. Kinney was licensed by the State of Texas as a local recording agent to sell insurance (Tex. Ins. Code Ann. art. 21.14 (1963)), and during that period, he maintained an office in the area of southwest Houston. As a local recording agent, he was authorized by insurance companies to sell insurance to the public, and he was required to maintain an office and records of all insurance transactions which occurred in his office. Tex. Ins. Code Ann., *supra.*

On March 23, 1962, the petitioner executed a memorandum of agreement in which he agreed to sell his insurance agency for an amount equal to 1½ times the agency's annual insurance commissions, or approximately $125,000, plus $5,000 for the furniture and fixtures of the agency. The memorandum of agreement also provided that Mr. Kinney would not "compete in the insurance business in Harris County, Texas, for a period of five years other than working for the purchaser." The purchaser was the Gem Insurance Agency, a three-man partnership.

On May 1, 1962, the purchaser took over operational control of the business, and on May 26, 1962, an agreement and bill of sale were executed, which were effective as of May 1, 1962. Under the terms of the agreement, Mr. Kinney transferred to the purchaser the office furniture and fixtures, the goodwill of the agency, the exclusive right to use the name "Kinney Insurance," the exclusive property right in and to the expirations of all insurance policies written by the agency, and "the exclusive property right to control and solicit renewals of all said policies." An expiration is a copy of a portion of an insurance policy, not including the insuring provisions, but setting forth all the statistical information, including the names of the parties, the property covered, the premium, and the expiration date. In the agreement, Mr. Kinney also promised not to compete in the insurance business within a 50-mile radius of Houston for a period of 5 years (except as a solicitor for the purchaser), and he also promised, for a period of 10 years, not to solicit (except as a solicitor for the purchaser) the "sale of a renewal or replacement" or any other policy to any person holding, on May 1, 1962, a policy written by the agency. The purchaser agreed to pay Kinney $5,000 for the office furniture,

fixtures, and equipment; $10 for goodwill; $10 for use of the name "Kinney Insurance"; and $125,000 as "the balance of the amount payable by the Purchaser." The agreement also provided that the consideration would be paid concurrently with the execution of the agreement, but the $20 check for goodwill and use of trade name was dated June 8, 1962.

No amount was allocated to the covenant not to compete because the parties could not agree on the amount to be allocated, and the purchaser signed the agreement without allocation against the advice of tax counsel. The agreement was drafted by the purchaser or its counsel, and the only change which Mr. Kinney requested was to reduce the area included within the covenant not to compete from 100 miles to 50 miles. He requested this change because he was considering the possibility of moving to Austin, Tex. The purchaser would not have purchased the agency without Mr. Kinney's covenant not to compete. The bank, which financed the purchase, required the purchaser to obtain a covenant not to compete and verification of the authenticity of the policies written by the agency.

At the time of the sale, Mr. Kinney was deeply involved in the work of the Gideons and desired to spend more time in such work. He was financially able to live in the style to which he was accustomed without the income from the agency, and his physician had advised him that he had hypertension and should avoid stress. Mr. Kinney told the purchaser that he desired to spend more time working with the Gideons, but he did not inform the purchaser that he was suffering from hypertension.

When the agency was sold, it had some 2,500 to 3,000 customers and some 4,000 policies in force. Mr. Kinney could recognize 300 to 400 of his customers and remember the names of approximately 100. None of the customers were related to Mr. Kinney by blood or marriage, and most were individuals as opposed to commercial enterprises. The largest commercial customer accounted for 3 to 4 percent of the commission income of the agency, and all the large commercial accounts combined accounted for only 7 to 8 percent of such income. Fire and windstorm insurance accounted for 70 percent of the commission income of the agency, automobile insurance accounted for 20 percent of the income, and miscellaneous insurance accounted for 10 percent.

In addition to Mr. Kinney, the agency had approximately five female employees doing various types of work, a female telephone solicitor, and a male solicitor. A solicitor is a licensed insurance agent who is not required to maintain an office or records, and who must work for a local recording agent. Tex. Ins. Code Ann., *supra*. At the time of the sale of the agency, Mr. Kinney was personally soliciting 35 to 40

percent of the agency's new business and 10 to 15 percent of the agency's renewal business. Most of the agency's business was renewal business.

Approximately one-half of the agency's new business was acquired through use of 3- and 5-year-old copies of the Daily Record, a legal newspaper, which listed real estate transfers and the names of the parties involved. Because home insurance is usually acquired on or near the date of the real estate transfer and because the policies were generally for 3 or 5 years, it could be approximated when a policy was about to expire. One of the female employees would call the home-owner, and if the owner was interested in being insured by the agency, a solicitor or Mr. Kinney could contact him. About 2 to 3 percent of the persons called purchased insurance from the agency.

The solicitation of renewals was based on the expirations. The agency filed its expirations in order of the date of the expiration of the policy, and when a policy was about to expire, a staff member telephoned the policyholder and inquired whether he desired to have the policy renewed. Generally, 90 to 95 percent of the policies were renewed, and 95 percent of these renewals were done solely by telephone without the need of a personal visit.

The purchaser sought to retain the services of Mr. Kinney and his staff. However, the male solicitor formed his own agency, and at least 40 policyholders switched to his agency. Mr. Kinney maintained an office at the agency. Although he did not necessarily work a full business day, he did go to the office each business day, and he did produce business for the purchasers. On February 25, 1963, he signed a contract with the purchaser in which he agreed to be a solicitor for the agency; yet, prior to that time, some disagreements had arisen between Mr. Kinney and the purchaser, and at about this time, he moved his furniture from the office. He allowed his local recording license to expire in March 1963, and he never obtained another insurance license.

The petitioner allocated $125,000 of the sale price to the expirations and reported the entire gain on the sale of the agency as a long-term capital gain. The respondent determined that $125,000 of the sale price was attributable to the covenant not to compete and taxable as ordinary income.

The members of the Gem partnership allocated $125,000 of the sale price to the covenant not to compete and claimed amortization deductions for the years 1962 through 1966. The respondent disallowed the deductions and such action is presently being contested by the partners in the District Court.

OPINION

The issue to be decided is what portion of the $125,000, if any, is allocable to the covenant not to compete. The petitioners contend that

no amount can be allocated to the covenant because it is not severable from the assets and goodwill of the agency which were transferred to the purchaser. Alternatively, the petitioners contend that only a nominal amount is allocable to the covenant. The respondent contends that the covenant not to compete has independent significance and that a major portion of the purchase price is allocable to it.

In *Balthrope* v. *Commissioner*, 356 F. 2d 28, 31 (C.A. 5, 1966), affirming a Memorandum Opinion of this Court, the Fifth Circuit evaluated the severability test upon which the petitioner relies and stated that:

The "severability" test, if it does not beg the question, has been criticized as ignoring the relationship between a covenant not to compete and the sale of goodwill. * * * Any covenant not to compete must to some degree protect the reputation and customer loyalty transferred with the goodwill of the business. Indeed, the covenant is unenforceable if intended for purposes other than protecting goodwill. 6 Corbin, Contracts § 1387. The only covenant that would not to some degree protect goodwill would be a covenant that had no basis in economic reality. Since directly determining whether a covenant has economic reality is the threshold inquiry in all of these cases, the indirect "severability" test for the same purpose has little probative value and less utility. * * *

See *Barran* v. *Commissioner*, 334 F. 2d 58, 63 (C.A. 5, 1964), affirming on this issue 39 T.C. 515 (1962); *Schulz* v. *Commissioner*, 294 F. 2d 52, 55, 56 (C.A. 9, 1961), affirming 34 T.C. 235 (1960).

The petitioner argues, however, that *Balthrope* does not apply in the present case because it involved a situation where there had been an allocation to the covenant and because in earlier cases, where there had been no allocation, the Fifth Circuit utilized the severability test. *Commissioner* v. *Killian*, 314 F. 2d 852 (C.A. 5, 1963), affirming a Memorandum Opinion of this Court; *Masquelette's Estate* v. *Commissioner*, 239 F. 2d 322 (C.A. 5, 1956), reversing a Memorandum Opinion of this Court. However, nothing in *Balthrope* indicates that the court intended to look at economic reality when there was an allocation and not look at it when there was no allocation. Indeed, the reasoning of *Balthrope* would seem to be equally applicable in both situations, and in *Barran* v. *Commissioner*, *supra* at 63, the Fifth Circuit pointed out that the court would have reached the same result in *Commissioner* v. *Killian*, *supra*, by applying the economic reality test as by applying the severability test. In view of the court's statements in *Balthrope*, we are convinced that, when a covenant has substantial value, the Fifth Circuit will allocate a portion of the purchase price to it, irrespective of whether or not the parties have allocated any value to it. Since this case arose in the Fifth Circuit, we shall carefully consider the law of that circuit. See *John T. Dodson*, 52 T.C. 544 (1969).

Moreover, after reviewing the decisions of this Court, we are con-

vinced that they are consistent with our understanding of the position of the Fifth Circuit. This Court has refused to allocate any part of the purchase price to a covenant when it found that the covenant lacked value. See, e.g., *Howard Construction, Inc.*, 43 T.C. 343, 355 (1964); *North American Loan & Thrift Co. No. 2*, 39 T.C. 318, 326 (1962), affirmed per curiam 319 F. 2d 132 (C.A. 4, 1963); *Edward A. Kenney*, 37 T.C. 1161, 1169 (1962); *Aaron Michaels*, 12 T.C. 17, 19–20 (1949). However, those opinions indicate that if the covenant had independent value, a part of the purchase price would be allocated to it, at least in the absence of an agreement between the parties to allocate no amount to the covenant.

We have found that Mr. Kinney and the purchaser failed to allocate any of the consideration to the covenant not to compete because they could not agree on the amount to be allocated. The witnesses disagreed as to whether there was any discussion of the amount to be allocated to the covenant. The three members of the partnership that purchased the agency all testified, and although they were excluded from the courtroom when not testifying, their accounts of the conversations were substantially consistent. In addition, we found credible their testimony that as businessmen acting with the advice of counsel, they were aware of the need to have an amount allocated to the covenant and sought to secure such an allocation. Since the failure to allocate was due to such disagreement between the seller and purchaser, the absence of the allocation does not indicate that they considered the covenant to have no value. Compare *Rich Hill Insurance Agency, Inc.*, 58 T.C. 610 (1972). Furthermore, inasmuch as the parties did not agree that nothing should be allocated to the covenant, we do not reach the question of whether, or under what circumstances, a party could set aside such an agreement and contend that some amount should be allocated to the covenant based on its value. Compare *Yates Industries, Inc.*, 58 T.C. 961 (1972). As a party is not attempting to vary the language of the agreement, we do not have a situation in which the "strong proof" test is applicable. See *Glen W. Lucas, Jr.*, 58 T.C. 1022 (1972).

The covenant not to compete in the present case had substantial value. Mr. Kinney had been in the Houston insurance business for over 20 years, and during that time, he had built a large and successful business. At the time of the sale, he was personally soliciting 25 to 35 percent of the agency's new business and 10 to 15 percent of its renewal business. Through his Gideon activities, he had the opportunity to meet many people. In view of his past success, we are convinced that if Mr. Kinney had undertaken to continue in the insurance business in Houston after the sale, he would have attracted a substantial number of his former customers. At the age of 55, he was not at the

end of his working life, even though he was suffering from hypertension. Indeed, he continued to work for the agency on a daily basis through February 1963. He even signed a solicitor's agreement with the agency, and at one time, considered the possibility of soliciting in Austin, Tex. The members of the partnership who purchased the agency all testified that they considered the covenant to be essential in order to protect their investment, and we found such testimony to be convincing. Furthermore, the bank financing the purchase required the purchaser to obtain a covenant not to compete. Under these circumstances, we hold that Mr. Kinney's desire to reduce his business activities and his ability to live without the income from the insurance agency affect the value to be allocated to the covenant not to compete, but they fail to show that the covenant lacked substantial value.

The parties agree that the expirations had value, and on the basis of the record before us, we must now determine what part of the $125,000 to allocate to the expirations and what amount to allocate to the covenant. As stated by the court in *Levine* v. *Commissioner*, 324 F. 2d 298, 302 (C.A. 3, 1963), affirming a Memorandum Opinion of this Court:

It [the Tax Court] did agree that both items [goodwill and a covenant not to compete] were valuable. In those circumstances to allow nothing for the good will or for the covenant or for both would have been at the least inconsistent. At the same time one hundred per cent accuracy in fixing the respective amounts was impossible. So the court made the closest approximation it could. See Cohan v. Commissioner, 39 F. 2d 540, 543–544 (2 Cir. 1930). * * *

Those words are precisely applicable to the task that we must now perform.

The record does show that the purchaser had acquired several insurance agencies, and that in these acquisitions approximately 65 percent of the consideration was allocated to the covenant not to compete. It also shows that there are several factors which indicate that the covenant in this case was of less value than in the other situations. The Kinney agency was the largest of those purchased, and without the expirations, it would have been very difficult for Mr. Kinney to remember a large percentage of the agency's customers. In addition, Mr. Kinney wanted to devote more time to the Gideons, and he communicated this intent to the purchaser. Although his health did not preclude his competing for business, it was such that Mr. Kinney might not desire to pursue the insurance business full time. Furthermore, he could live in the style to which he was accustomed without the income from the insurance business. However, for the reasons discussed in examining the reality of the covenant, it is apparent that Mr. Kinney was an able and experienced man who could successfully compete with the agency. Based on a careful examination of the evidence, we hold that

33 percent of $125,000 should be allocated to the covenant not to compete. See *Cohan* v. *Commissioner*, 39 F. 2d 540 (C.A. 2, 1930).

The petitioner contends, however, that all of his witnesses stated that the expirations themselves had a value of $125,000. Although the testimony of these witnesses is not completely consistent, it is apparent that they were treating the covenant and the expirations as a unit and that the $125,000 figure was the value of such unit.

The petitioner further argues that the covenant has little value because the transfer of the expirations included the transfer of the property right "to control and solicit renewals." However, such property right clearly does not apply to soliciting the business of new customers or old customers who desire additional insurance. In addition, there is substantial doubt as to whether it would apply to selling a different policy to an old customer in place of his present policy. Indeed, the covenant not to compete contains different provisions relating to replacement and renewal policies, while the property right refers only to renewal policies. The petitioner's argument that there is no showing that the agency has a substantial replacement insurance business is not responsive. Whether such business existed or not, Mr. Kinney, without the covenant, apparently could have drawn old customers away from the agency through the use of replacement policies.

Finally, the petitioner seems to suggest that we should take into account the fact that he did not understand the tax consequences of the sale and that the purchaser had tax counsel. We are not altogether convinced that the petitioner was ignorant of the tax consequences of the sale. In any event, we do not believe that such knowledge alters the value of the covenant. *Edmond A. Maseeh*, 52 T.C. 18 (1969).

*Decision will be entered under Rule 50.*