VALLEY BROADCASTING COMPANY, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Valley Broadcasting Co. v. Commissioner
Docket Nos. 6445-72, 6446-72, 7521-72, 7522-72
United States Tax Court
T.C. Memo 1974-247; 1974 Tax Ct. Memo LEXIS 63; 33 T.C.M. (CCH) 1099; T.C.M. (RIA) 74247; September 23, 1974, Filed. *63 In 1968 petitioners sold the assets of their business as a going concern including its goodwill. A separate clause in the agreement of sale provided as a condition to closing that the petitioners would convey a covenant not to compete executed by its general manager. The agreement of sale did not allocate any portion of the purchase price to a particular asset. Held: Petitioners have shown by a preponderance of the evidence that the contracting parties did not intend to allocate any part of the consideration to the covenant. In addition the covenant had minimal economic value. Therefore the portion of the purchase price in dispute is not assignable to the covenant. *64 Whitfield J. Collins and Harry E. Bartel, for the petitioners. John D. Copeland, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: The respondent determined deficiencies in petitioners' federal income tax as follows: Docket No.
Petitioner
Year
Deficiency 6445-72
Valley Broadcasting
Company
Jan. 1 - July 31, 1969
$33,000.00
*6446-72
Estate of Gene L. Cagle,
Whitfield J. Collins, Executor
Jan. 1 - July 31, 1969
$33,000.00
*7521-72
Jim R. Phillips
Jan. 1 - July 31, 1969
$33,000.00
7522-72
Jim R. Phillips Individually and as Executor of the Estate of Janet A. Phillips
1969
$30,669.51
*65 Upon petitioners' motion, to which respondent had no objection, these cases were consolidated for trial, briefs and opinion. The remaining issue in controversy common to these cases is whether Valley Broadcasting Company received an amount properly allocable to a covenant not to compete executed by its then president, Jim R. Phillips, in connection with the sale of its assets pursuant to a plan of complete liquidation under section 337, Internal Revenue Code of 1954, [2] making the shareholders of Valley Broadcasting Company, as transferees of its assets, liable for the deficiency. [3] An affirmative answer to the question will result in said amount being taxable as ordinary income. *66 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated by this reference. Petitioner, Valley Broadcasting Company (hereinafter Valley), is a dissolved Texas corporation. Whitfield Collins (hereinafter Collins) is the duly appointed liquidating trustee. Valley, prior to its dissolution in 1969, was a Texas corporation with its principal place of business at McAllen, Texas, and was the owner and licensee of Radio Station KRIO in McAllen. Petitioners, Estate of Gene L. Cagle, Whitfield J. Collins, Executor (hereinafter Cagle Estate), and Jim R. Phillips (hereinafter Phillips) are the transferees of Valley within the meaning of section 6901. These petitioners owned 80 percent and 20 percent of the Valley stock, respectively. Gene L. Cagle (hereinafter Cagle) was a stockholder in Texas State Network, Inc. which owned Valley. In March 1966, pursuant to a plan of liquidation, Cagle became the sole stockholder and president of Valley. The principal asset of Valley was KRIO. After acquiring control of Valley, Cagle asked Phillips to become the general manager of the *67 station. As an incentive Cagle offered Phillips the opportunity to purchase 20 percent of the Valley stock over a 3 year period. Phillips exercised these options, so by March 1968, he held a 20 percent interest in Valley stock. These options were part of an understanding between Phillips and Cagle. Phillips wanted their arrangement clearly to reflect his desire eventually to manage his own radio station. After the 3 year period, [4] Phillips could, if he wished, sell his stock back to Cagle or join with Cagle in a sale to a third party. The proceeds from the stock sale would provide Phillips with the necessary capital for his own venture. These intentions are evidenced by letter from Cagle to Phillips dated March 4, 1966.
Under these conditions Phillips accepted the offer and managed the station. While there the fortunes of the station improved. The gross billings rose from less than $300,000 to almost $400,000 by 1968. Phillips also became quite active in McAllen's community affairs establishing many business contacts. Cagle died on *68 March 31, 1968 and this accelerated the original long term plans of Phillips to purchase his own station and of Cagle (now the estate) to sell KRIO. Since there was no one else to manage the Valley interests and the Cagle Estate had a need for money, a cash sale of the radio station was proposed. The station was first offered to Phillips. However, he felt the station's potential in the McAllen area had peaked, and although the station was worth approximately $800,000 based on its gross billings, he would only offer $500,000. Consequently the estate initiated efforts to obtain the maximum price for the station. With the help of Boyd Kelley (hereinafter Kelley), an experienced media broker, Floyd Sheldon (hereinafter Sheldon) and Jack Crosby (hereinafter Crosby) became interested in buying the station. Sheldon and Kelley travelled to McAllen to inspect the station. They were met by Phillips who led them on an inspection tour of the physical plant and provided them with financial statements. During these discussions Phillips stated his intention to Sheldon and Kelley to leave the McAllen area, but it is unclear whether a covenant not to compete was also discussed at this time. *69 After this meeting Sheldon analyzed the financial data to develop an offering price. Sheldon used two different methods to value the station. One was based on the average cash flow over a 3 year period multiplied by a factor of 6.5, the other was based on the average gross billings over a 3 year period multiplied by a factor of 2. Both of these methods approximated the value of the station at $749,000. [5] Based on his calculations Sheldon, through Kelley, telegraphed an offer on August 21, 1968, to Phillips to purchase the station's assets for $725,000. [6] The pertinent portion of the telegram reads as follows: * * * Jack R. Crosby or his nominee hereby offer to purchase all assets of Valley Broadcasting Co., Inc., licensee of KRIO McAllen, Texas for a net cash price of $725,000.00 assets as shown balance sheet of July 31, 1968 exclusive of cash on hand, account and notes receivable, stock and bonds. Offered subject to approval of FCC, no material adverse change in stations position at time of closing and completion of a mutually satisfactory agreement of sale.A check in the amount of $50,000.00 is extended to Kelley Associates to be placed in escrow as certificate of deposit *70 with agent of seller choice upon completion of mutually satisfaction agreement of sale. This offer of purchase expires at 5 PM CDT. Friday Aug. 30. * * *. This offer was later extended to September 16, 1968 in a letter to Collins from Crosby. Based on this offer a meeting was held in *71 Collins' office on August 26, 1968, to negotiate an agreement of sale. Collins and Jackson Cagle represented the sellers and Sheldon and Crosby represented the buyers. Kelley was also present and Phillips was kept abreast of events via the telephone. Both Collins and Sheldon had previously been involved in negotiations concerning the buying and selling of radio stations, though Collins, a tax attorney, was more familiar with the tax considerations involved. At the meeting the buyers insisted that a covenant not to compete statement, signed by Phillips, be delivered to them at closing to insure that Phillips would not compete with the buyers in the 4 county area surrounding McAllen for 5 years. No additional consideration was offered for the covenant. Despite the insistence on the covenant there were no discussions relating to allocation of any portion of the purchase price to the covenant or to any other asset. Following this meeting Collins drafted an agreement of sale incorporating the covenant not to compete. The pertinent sections of the agreement are as follows: 1. Property and Assets Being Sold. Subject to the terms and conditions of this Agreement, Seller, on the Closing *72 Date, shall sell, assign, transfer and deliver to Buyer, and Buyer shall purchase and accept delivery from Seller, all of the assets and property of the Seller as follows: (a) All of the Seller's tangible assets, consisting of real estate, buildings, machinery, equipment, appliances, tools, fixtures, furnitures, supplies, parts and props, shown on the balance sheets of Seller as of December 31, 1967, attached hereto as Exhibit "A", and as of July 31, 1968, attached hereto as Exhibit "B", and on schedule of assets attached thereto, except as consumed or replaced in the normal course of Seller's business operations, and all such tangible assets and equipment being used in or about the operation of Radio Station KRIO on the Closing Date. (b) All of Seller's intangible assets (with the exception of those excluded properties described in (c) below), consisting of all contracts, contract rights, agreements and leases (including but not limited to those listed in Exhibit "C" attached, but specifically excluding any contracts of employment or for bonuses), together with all good will, trademarks and trade names of Seller and all claims, customer lists, trade agreements, reports, drawings, *73 plans, specifications, procedure manuals, credit records, sales records, program logs, books and records kept pursuant to the rules of the Commission, and similar documents utilized by the Seller in conducting business operations. (c) All real, personal, mixed, tangible and intangible property of the Seller except and excluding (1) cash on hand or deposited to the credit of the Seller, (2) any and all accounts and notes receivable, (3) life insurance policies on officers, employees or stockholders of Seller, and * * * 2. Purchase Price. The purchase price of the assets being sold and purchased hereunder is Seven Hundred Twenty-Five Thousand ($725,000) Dollars, and shall be paid in cash by the Buyer to the Seller in full on the Closing Date by bank cashier's check or certified check, subject to the prorations and adjustments, if any, provided for by Paragraph 15. * * * 12. Seller's Performance at Closing. On Closing Date and simultaneously with delivery to Seller of the purchase price as provided herein, Seller shall deliver to Buyer: * * * (g) A duly executed covenant not to compete signed by Jim R. Phillips, President of Seller, whereby he agrees not to engage, *74 directly or indirectly, in any form of broadcasting whether aural or video or in the CATV business within the counties of Cameron, Hidalgo, Willacy and Starr, State of Texas, for a period of five (5) years after the Closing Date. Copies of the agreement were sent to Crosby and Sheldon for their comments. Crosby had his attorney review the draft. He called Collins and some non-controversial changes were made. A final agreement of sale was prepared and sent to the parties, and by September 6, 1968, it was signed. During this period Collins had checked with Phillips about complying with the covenant clause at closing, and Phillips expressed no objection. The sale was completed April 30, 1969, after receiving approval from the Federal Communications Commission (hereinafter FCC). At closing Phillips did deliver a covenant not to compete in favor of the buyers which contained a recitation of $10 consideration to be paid to Phillips by Valley, [7] and Collins delivered a legal opinion letter stating, among other things, that this covenant was legally binding. Sheldon, at closing, was aware of the consideration stated in the covenant but did not challenge it. *75 Following the sale and pursuant to a plan of complete liquidation adopted by the board of directors and stockholders of Valley on July 25, 1968, under the provisions of section 337 of the Code, Valley was liquidated. The liquidation was accomplished by May 5, 1969.
The assets of Valley were distributed to its shareholders in proportion to their ownership of the stock. Phillips did not receive, nor did he expect, anything in addition to the amount he was entitled to for his 20 percent interest. As the sale progressed to its conclusion, Phillips was investigating other radio properties. Previously he had discussed several possibilities with Cagle and others, and by 1968, he was primarily interested in a radio station in El Paso, Texas. [8] By the time the McAllen station was sold, Phillips had already signed an agreement of sale and had his application filed with the FCC. Phillips left McAllen about two months after the sale and moved to El Paso where he gained control of the station on December 1, 1969. The buyers, following the sale, allocated the purchase price to the assets acquired. *76 They made a detailed inventory and assigned values to the physical assets and the covenant not to compete. The excess was assigned to goodwill. The individual valuations were determined after discussions with the buyers' accounting firm. The covenant's ultimate value, $62,500, was based on Phillips' experience and ability in the radio business and what they felt Phillips would lose by not working in the McAllen area. This valuation is the basis for respondent's deficiency determination that Valley received ordinary income in the amount of $62,500 for the covenant not to compete executed by its then president, Phillips, in connection with the sale of assets of the radio station. OPINION The sole issue to be decided is what portion of the purchase price, if any, is to be allocated to the covenant not to compete obtained by Sheldon and Crosby in connection with their purchase of Valley's main asset-Radio Station KRIO in McAllen, Texas. The law regarding this issue is relatively clear. Amounts paid by a purchaser to a seller for goodwill result in capital gain to the seller, with the *77 purchaser acquiring an intangible asset which may not be amortized. However, amounts paid by a purchaser for a covenant not to compete are ordinary income to the seller, since they represent a substitute for future ordinary income, and may be amortized by the purchaser over the covenant's useful life. Throndson v. Commissioner, 457 F.2d 1022 (9th Cir. 1972) affirming sub. nom. J. Leonard Schmitz, 51 T.C. 306, 313 (1968). Sec. 1.167(a)-3, Income Tax Regs.
Reviewing the basic facts briefly, in 1966 Cagle became president and sole shareholder of Valley, whose main asset was Radio Station KRIO in McAllen, Texas. Cagle asked Phillips to become the station's general manager and offered him options to buy 20 percent of the Valley stock. Under Phillips' management the station's fortunes improved. However, two years later, in 1968, Cagle died and his estate decided to sell the station and liquidate Valley. An offer was received from Sheldon and Crosby. Negotiations followed and an agreement of sale was signed. In these negotiations, the buyers insisted on receiving a covenant not to compete from Phillips, but there was no discussion *78 with respect to any allocation of the purchase price to the covenant or any other asset transferred. After the requisite FCC approval was obtained, the sale was closed in April, 1969. After the sale, Valley was liquidated with the distributions going to the shareholders according to their percentage of stock ownership. Upon acquiring control, the buyers, in conjunction with their accountant allocated the purchase price among the assets purchased including an amount of $62,500 to the covenant not to compete. The question of allocation of the purchase price of a business among such items as a covenant not to compete and goodwill has been the subject of much discussion. One of the many cases in this area two basic theories have evolved - the severability theory and economic reality theory. Rich Hill Insurance Agency, Inc. 58 T.C. 610, 616 (1972). The Fifth Circuit, to which this case would go in the event of an appeal, has adopted the economic reality test. In Balthrope v. Commissioner, 356 F.2d 28, 31 (5th Cir. 1966), the court said: The "severability" test, if it does not beg the question, has been criticized as ignoring the relationship between *79 a covenant not to compete and the sale of goodwill. * * * Any covenant not to compete must to some degree protect the reputation and customer loyalty transferred with the goodwill of the business. Indeed, the covenant is unenforceable if intended for purposes other than protecting goodwill. * * * The only covenant that would not to some degree protect goodwill would be a covenant that had no basis in economic reality. Since directly determining whether a covenant has economic reality is the threshold inquiry in all of these cases, the indirect "severability" test for the same purpose has little probative value and less utility. * * * [Citations omitted] The substance of the economic reality test is a determination of whether the parties to the agreement intended to allocate a portion of the purchase price to the covenant not to compete at the time they executed their formal sales agreement. This allocation would tend to establish that the covenant had some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with *80 their economic future, would bargain for such an allocation to be part of the agreement. General Insurance Agency, Inc. v. Commissioner, 401 F.2d 324, 330 (4th Cir. 1968), affirming a Memorandum Opinion of this Court. See also Barran v. Commissioner, 334 F.2d 58, 63 (5th Cir. 1964) affirming on this issue 39 T.C. 515 (1962); Balthrope, supra at 31-32. Respondent's position, that the covenant has value, is based mainly on his contention that Sheldon insisted from the beginning that the buyers receive a covenant not to compete from Phillips. We find the record unclear as to when the covenant was first discussed, but nevertheless the agreement of sale did contain a requirement that Valley deliver to the buyers at closing an appropriate covenant not to compete. Despite their insistence, there were never any discussions about allocating a part of the purchase price to the covenant. At closing Sheldon did not challenge the covenant, which showed a $10 consideration being paid by Valley to Phillips when it was delivered. Respondent suggests this lack of discussion was due to the fact that Sheldon, the main representative for *81 the buyers, was unaware of the tax consequences involved. However, the record indicates that Sheldon, though neither a lawyer nor an accountant, was experienced in negotiations of this type. He had even negotiated similar deals with Collins in which covenants had been discussed and paid for separately. Consequently, we believe that Sheldon, as an experienced businessman, knew that a covenant not to compete could be a valuable item worthy of discussion if the situation warranted. The record also reveals that Crosby's attorney, though not present at the August 26, 1968, meeting did review a copy of the proposed agreement of sale before it was signed. He suggested some minor changes which were made, but apparently had no suggestions with respect to the allocation of the purchase price. On these facts we believe the buyers were adequately represented during the negotiations and had ample opportunity to discuss the matter. The failure of the contracting parties to allocate a part of the consideration to the covenant not to compete, although not conclusive by itself, is strong evidence that *82 no such allocation was in fact intended. Delsea Drive-In Theatres, Inc. v. Commissioner, 379 F.2d 316 (3rd Cir. 1967), affirming per curiam a Memorandum Opinion of this Court. Respondent asserts that this case is on "all fours" with that of Harry A. Kinney, 58 T.C. 1038 (1972). In Harry A. Kinney, supra, the agreement of sale between the parties did not allocate any portion of the purchase price to a covenant not to compete that was part of the agreement. However, this Court found that the failure to allocate was due to a disagreement between the parties, not because there was no discussion at all. This Court stated: "Since the failure to allocate was due to such disagreement between the seller and purchaser, the absence of the allocation does not indicate that they considered the covenant to have no value". Harry A. Kinney, supra at 1043. The Court ultimately did assign a value to the covenant. We find Harry A. Kinney, supra, to be distinguishable since the facts of the case at bar do not reveal any discussions with respect to the value, if any, of the covenant. However, Harry A. Kinney, supra, *83 was also a Fifth Circuit case, and the Kinney Court interpreted Balthrope, supra, as indicating that the Balthrope court would conduct a search of the other facts to see if the covenant had an economic reality to it even when there was no allocation. This Court stated: "In view of the court's statements in Balthrope, we are convinced that, when a covenant has substantial value, the Fifth Circuit will allocate a portion of the purchase price to it, irrespective of whether or not the parties have allocated any value to it". Harry A. Kinney, supra at 1042. After analyzing the entire factual pattern of this case, we find this lack of intention towards an allocation is substantiated by several additional factors that show the covenant to be of no particular economic value. Throughout the course of events, Phillips made clear his intention not to remain in the McAllen area. While working in McAllen, he had investigated other radio stations that were available for sale. After Cagle's death he rejected the opportunity to purchase the McAllen station. When Sheldon *84 made his inspection tour, Phillips stated his intention not to remain in the area, and he rejected Sheldon's strong efforts to persuade him to remain. As the sale was proceeding towards its conclusion, Phillips was moving definitively toward the purchase of a radio station outside the proscribed area. This transaction was completed approximately 6 months later. Phillips' intentions seem clear, and show that the buyers had little reason to expect competition from Phillips in the McAllen area. After Sheldon made his inspection tour he formulated his offer. We have detailed in our findings how the offer was determined, and we are impressed that two separate methods resulted in approximately the same value for the station. In those calculations it appears that the effect of a covenant was not considered. Respondent urges that the original telegraph offer included an amount for the covenant on the basis that the offer was subject to "completion of a mutually satisfactory agreement of sale". We find this condition too broad to be used to cover specifically the covenant, and in view of the buyer's failure to follow up with specific discussions towards an allocation, we believe this *85 position to be of little merit. Consequently we believe the $725,000 purchase price represented the full value of the station's assets and an additional amount would have been needed to compensate either Valley or Phillips for the covenant. See Howard Construction, Inc., 43 T.C. 343, 355 (1964). After the sale, Valley was completely liquidated. The distributions were made to the stockholders in relation to their percentage interest in Valley. Even though the Cagle Estate did not join in the execution of the covenant, it still received as much for its stock as Phillips did for his. This is further evidence that nothing was paid for the covenant. The Rinehart Oil News Company v. Commissioner, 369 F.2d 692 (5th Cir. 1966), affirming per curiam a Memorandum Opinion of this Court; Howard Construction, Inc., supra at 356. Finally, respondent asserts that the allocation by Sheldon should be upheld since it was made under the supervision of a certified public accountant who testified that the method and the amount of the allocation was reasonable. The final allocation was a compromise based on Phillips' ability in the radio business and what *86 he would lose by not working during the 5 year period. The accountant, however, was not involved in the negotiations and there is no evidence that indicates he was aware of the circumstances, as discussed above, surrounding the transaction. Since the allocation does not reflect the seller's position, we find this after-the-fact allocation to be of little probative value. After careful consideration of the record, using the economic reality test as a guide, we find that there was never any intention to allocate a part of the purchase price to the covenant not to compete and, further, that other evidence substantiates the conclusion that the covenant had no independent economic vitality. Based on this finding it follows that we hold that no part of the purchase price should now be allocated to the covenant. Consequently, we hold that Valley did not receive ordinary income in connection with the sale of its assets, and that the Cagle Estate and Phillips cannot therefore be liable as transferees for any additional tax with respect to this issue. Decision will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Estate of Gene L. Cagle, Whitfield J. Collins, Executor, docket no. 6446-72; Jim R. Phillips, docket no. 7521-72; Jim R. Phillips, Individually and as Executor of the Estate of Janet A. Phillips. docket no. 7522-72. ↩
*. Deficiencies were determined against petitioners in these cases as transferees of the assets of Valley Broadcasting Company for a deficiency in income tax due from Valley Broadcasting Company within the terms of section 6901, Internal Revenue Code of 1954↩ as amended. 2. All Code references are to the Internal Revenue Code of 1954 as amended. ↩
3. Respondent originally determined that Phillips had, in his individual capacity, received ordinary income as the executor of the covenant not to compete. Subsequently respondent has conceded that issue and now the deficiency in docket no. 7522-72 contains only two items - a dependency exemption to which petitioner conceded error in his original brief, and the amount of the medical expense deduction which depends on the final determination of petitioners' adjusted gross income for the calendar year 1969. ↩
4. A 3 year period is the minimum holding period required by the Federal Communications Commission before a license can be transferred. ↩
5. Cash Flow Method
1966
1967
1968
Operating Profit
$34,001
$ 80,872
Home Office
19,343
12,076
Cagle Travel
--
4,000
Cagle Salary
30,000
12,000
Directors Fees
--
675
Depreciation 14,599 14,497 $97,943
$124,120
$123,688 (estimated)
Total for 3 year period
$345,751
Average
$115,250
Multiplied by factor of 6.5 $749,120 [sic] Gross Billing Method 1966
$332,939
1967
392,023
1968
(estimated) 398,400
Total
$1,123,362
Average
374,454
Multiplied by factor of 2 $748,908
The cash flow calculations for 1966 do not include a manager's bonus of $15,000, and the estimated figures for 1968 for both methods are labeled as being conservative. ↩
6. The buyers also paid Kelley $25,000 for his services, making the total purchase price $750,000. ↩
7. We do not consider this consideration to represent an allocation of part of the purchase price to the covenant, and neither does respondent. ↩
8. El Paso, Texas is not within the area described in the covenant not to compete. ↩