HARRIS L. WOOD and HARRIETT E. WOOD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wood v. Commissioner
Docket No. 7173-73
United States Tax Court
T.C. Memo 1975-189; 1975 Tax Ct. Memo LEXIS 182; 34 T.C.M. (CCH) 817; T.C.M. (RIA) 750189; June 17, 1975, Filed Harry H. Perdue, Jr., for the petitioners. Roy S. Fischbeck, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACTS AND OPINION STERRETT, Judge: The respondent determined a deficiency in petitioners' federal income tax for the taxable year 1969 in the amount of $124,242. Of the several issues raised by the respondent during his audit of the petitioners' tax return two basic issues remain to be decided. The first issue is whether a portion of the $967,652 payment to petitioner Harris L. Wood in a transaction, purporting to be a sale of stock, in fact constituted consideration paid to petitioner for the cancellation of employment *184 contracts which cancellation was a condition to the purported sale. The second issue is whether the petitioners were engaged in the trade or business of farming and cattle-raising thereby entitling them to deduct the loss incurred in connection with that activity; or, if the petitioners were so engaged, whether they are entitled to deduct all of the expenses incurred in connection with their loss as claimed on their tax return for 1969. FINDINGS OF FACT Some of the facts are stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated by this reference. Petitioners, Harris L. Wood (hereinafter petitioner) and Harriett E. Wood, are husband and wife who resided in East Point, Georgia, at the time of the filing of their petition herein. Petitioners filed a joint federal income tax return for the taxable year 1969 with the internal revenue service southeast service center at Chamblee, Georgia. At all times relevant to the case at bar TSI, Inc., formerly Teachers Securities Investment Company (hereinafter TSI), was a life insurance and real estate holding company, and Teachers National Life Insurance Co., Inc. (hereinafter *185 TNLI), a subsidiary of TSI, was a corporation organized as an insurance company. Both companies were organized under the laws of Kentucky with their principal business offices in Louisville, Kentucky. Petitioner was the founder and president of both TSI and TNLI. Also at all times relevant to the case at bar American Pyramid Companies, Inc. (hereinafter American) was a life insurance and real estate holding company organized and operated under the laws of Kentucky with its principal business office located in Louisville, Kentucky. In February, 1964 petitioner entered into an employment contract with TNLI for a term of 10 years which was later extended for an additional 10 years. Under the contract petitioner's salary was $25,000 per year plus a percentage of the gross first year premiums and a percentage of the gross renewal year premiums. The commissions paid under this provision amounted to $23,172, $22,100.38 and $8,311.23 for 1967, 1968, and the first five months of 1969, respectively. The contract also provided: * * * * *
Section 6. It is mutually understood and agreed between the parties hereto that this contract may be terminated by either party by the giving of ninety *186 (90) days written notice to the other, subject, however, to the following conditions: a. If this contract be terminated by Company for any cause, other than a violation of its terms and conditions, Company will pay to Employee the commissions provided for in subsection B of Section 2 for a period of five (5) years following termination, but in no event for a period beyond the term of this contract. b. If this contract be terminated by Employee, Company will pay to Employee the commissions provided for in subsection B of Section 2 for a period of three (3) years following termination, but in no event for a period beyond the term of this contract. * * * * *
In October 1966 petitioner entered into an employment contract with TSI for a term of 20 years. Petitioner's salary under this contract was $25,000 per year. The contract also had similar termination clauses as those quoted above, except that if TSI terminated the contract it was required to make the compensation payments for the remaining term of the contract. Early in 1969, petitioner was approached by George T. Breathitt (hereinafter Breathitt) who asked petitioner if he was interested in selling his interest in TSI *187 and TNLI. At this time petitioner owned 241,913 shares of stock in TSI, and an additional 3,900 shares were owned by petitioner's family. These shares represented approximately a 15 percent interest in TSI. Breathitt introduced petitioner to Robert T. Shaw (hereinafter Shaw) who was president of American. Negotiations between these men followed and on April 15, 1969, a formal proposal encompassing various actions was made to petitioner by American. American proposed to purchase authorized, but unissued, shares of common stock of TSI for assets, and to have TSI purchase all of the outstanding common stock of Christian FoundationLife Insurance Company (hereinafter Christian) and merge it into TNLI. Since petitioner's interest in TSI would be diluted if these proposals were put into effect, American also proposed to purchase all his stock in TSI for $2.75 per share, to settle the existing employment contracts for $300,000 payable over a 12 year period, and to retain petitioner as a part-time employee on a consulting basis for $30,000 per year for 12 years. Petitioner signed a statement agreeing in principle to this proposal subject to receiving a legal opinion from his attorneys with *188 respect to its legality. Subsequent negotiations were conducted between petitioner's attorneys and American. Petitioner kept abreast of developments through his attorneys. Although the matter of petitioner's employment contracts was discussed, at no time did the parties mutually agree that he should receive any consideration for the termination of these agreements. Following these discussions American made a second offer to petitioner and TSI. In it they proposed: 1. That five (5) representatives of American Pyramid be elected to the Board of Directors of TSI; and 2. That American Pyramid purchase all of the shares of TSI owned by Mr. Harris Wood for $4.00 per share; and 3. That Mr. Harris Wood resign as a director, officer and employee of TSI and of all of TSI's affiliated and/or subsidiary companies; and 4. That Mr. Harris Wood forfeit and release TSI and TSI's affiliated and/or subsidiary companies from any and all contractual obligations arising under any contracts and agreements between Mr. Wood and such companies. 5. That American Pyramid sell and TSI buy all of the outstanding stock of Christian FoundationLife Insurance Company for consideration consisting of *189 a $1,000,000 promissory note from TSI to American Pyramid and the issuance by TSI to American Pyramid of approximately 575,000 shares of the authorized but unissued common stock of TSI, the exact number to be identical to certain values arrived at by Mr. Wolf, an actuary representing TSI. The foregoing proposals supersede all prior proposals made by American Pyramid to TSI. In connection with the fifth part of the above offer, TSI requested a firm of consulting actuaries to value Christian. After a review of Christian's financial data, TSI was advised that $2,310,000 was a fair price for the purpose of negotiating the acquisition of Christian. An agreement was written covering the sale of petitioner's stock to American, and it served as the basic document when this transaction was closed on May 28, 1969. At the closing there was no disagreement with respect to the purchase price, but there was an attempt by American to have petitioner accept a portion of the purchase price over a period of time. There was no discussion with respect to how the purchase price was to be allocated. After the transaction occurred a report was filed with the Securities and Exchange Commission by *190 those now in control of TSI which indicated that a portion of the purchase price had been allocated to petitioner's employment contracts. In TSI's notice of its annual meeting of shareholders that was held in 1970, the purchase of petitioner's shares by American was described with approximately $307,000 being allocated to petitioner's employment contracts. In June, 1969 petitioner purchased a 295 acre farm in Shorter, Alabama. In July, 1969 he purchased 50 head of cattle, and in late 1969 he acquired 24 head of Charolais cattle. Before entering into this activity petitioner had no prior farming or cattle raising experience. This activity was operated as a sole proprietorship until it was incorporated under the name of Woodhaven Charolais Ranch, Inc. in February, 1970. In October, 1970 petitioner organized Trans-World Charolais, Inc. in an attempt to sell stock of this corporation to the public. The attempt was only minimally successful. At first the operation was run by petitioner and his son, but in January, 1970 a ranch manager, experienced in raising Charolais cattle, was hired. Petitioner spent 90 percent of his time running this operation and lived both on the farm and in *191 town. Petitioner incurred various expenses in connection with this activity and reported a net loss of $57,207 on his tax return for 1969. In September, 1969 petitioner leased from W. J. Sorrell approximately 3,689 acres of pasture land in Macon County, Alabama. Under the terms of the lease the first rental payment of $15,200 was due October 1, 1969, and covered the period from October 1, 1969, through December 31, 1970. Thereafter rent of $12,200 was due in January 1 of each year until the lease terminated on December 31, 1975. Petitioner paid the $15,200 rental payment and deducted it as a business expense on his 1969 tax return. In December, 1969 petitioner purchased farm equipment which he elected to depreciate over an eight year life. Petitioner did not claim depreciation under section 167, Internal Revenue Code of 1954[1] for 1969, but he did claim additional first-year depreciation in the amount of $973 under section 179. Petitioner realized $967,652 (241,913 shares at $4 per share) on the sale of his TSI stock. His basis in these shares was $347,288 and he reported *192 the $620,364 difference as long-term capital gain. Respondent determined that of the amount realized $665,260 (241,913 shares at $2.75 per share) was for petitioner's stock and $302,392 represented "consideration for the waiver of your rights under employment contracts with [TSI] and [TNLI] * * * and is taxable as ordinary income." Respondent accordingly decreased petitioner's long-term capital gain and increased his ordinary income. Respondent also disallowed the $57,207 claimed as a net farm loss determining that it was neither incurred in connection with petitioner's trade or business nor incurred for the production or collection of income during the taxable year, and that rather such expenditures should be added to petitioner's cost basis in his common stock of Woodhaven Charolais Ranches, Inc. Alternatively respondent made adjustments to petitioner's reported farm loss and determined that it should be $43,565.85. Respondent determined that $12,000 of the $15,200 paid as rent in October, 1969 was prepaid rent and was not deductible in 1969, and that petitioner was not entitled to the additional first-year depreciation of $973 claimed on the farm equipment purchased in December, *193 1969. Petitioner has not contested any of the other adjustments respondent made with respect to petitioner's claimed farm loss. OPINION The case at bar presents two basic issues for our determination. The first issue is whether a portion of the amount received by petitioner in the transaction with American qualifies as ordinary income because it was received as consideration for the release of his employment contracts. The second issue is whether the petitioner was engaged in the trade or business of farming and cattleraising entitling him to deduct the loss incurred in connection with that activity; or, if petitioner was so engaged, whether he is entitled to deduct the full rental payment made in 1969 and to the additional first-year depreciation claimed on the farm equipment purchased in December, 1969 under the provisions of sections 162(a) (3) and 179, respectively. Petitioner received $967,652 (241,913 shares at $4.00 per share) on the sale of his TSI stock. As part of this transaction petitioner released TSI and TNLI from the employment contracts he had with each company. Respondent's position is that $302,392 of the amount realized, in fact, represents consideration for *194 the release of valuable employment contract rights and as such represents ordinary income to petitioner. Petitioner contends that the transaction was consummated after negotiations between the parties and that the resulting agreement, which does not include any allocation of the purchase price, reflects the true intentions of the parties. When the terms of an agreement result from deliberate negotiations this Court is not prone to give it a different interpretation. However, when the agreement neither conforms to the business or economic realities of the situation nor is the product of conflicting tax interests, we believe it is appropriate for this Court to examine the surrounding circumstances and make our own determination. See Ragland Investment Co.,52 T.C. 867, 879, affd. 435 F.2d 118 (6th Cir. 1970). See also Balthrope v. Commissioner,356 F.2d 28 (5th Cir. 1966), affirming a Memorandum Opinion of this Court. In the early part of 1969 petitioner was introduced to Shaw, the president of American, for the purpose of negotiating the *195 transfer of control of TSI to American through the acquisition of authorized but unissued shares of TSI and petitioner's stock interest in TSI. This first round of negotiations resulted in an offer by American to pay petitioner $2.75 per share for his 241,913 shares, or $665,260, to cause TSI to pay petitioner $300,000 payable over 12 years, for the release of his employment contracts, and $30,000 per year for 12 years for part-time consulting services for a total face value purchase price of $1,325,260. Petitioner noted his agreement in writing with this offer in principle subject to a legal opinion from his attorneys. At this point a second round of negotiations was conducted that culminated in a second offer from American to purchase petitioner's stock for $4.00 per share, or $967,652, with petitioner releasing his employment contract rights. An additional but integral part of the offer was for TSI to acquire all of the outstanding stock of Christian, a life insurance company owned by American, for a $1,000,000 promissory note and 575,000 shares of authorized but unissued shares of TSI. The approximate fair market value of Christian's stock was $2,310,000. The record makes it *196 clear that both parties considered the employment contracts to be valuable and enforceable. American first offered to have petitioner paid for the release of these rights, and then expressly conditioned the second offer on petitioner releasing his rights in these contracts. Shaw also testified that the cancellation of these employment contracts was an integral aspect of the entire transaction. Petitioner testified that, if TSI or TNLI did not perform according to the contract terms, he would have taken appropriate action. Petitioner points to the negotiations that led to the transaction during which there was never an agreement that petitioner should receive any consideration for the release of his employment contract rights. However, we believe that even though the parties did not agree on this matter that does not mean that the employment contracts had no value. In an analogous situation this Court in Harry A. Kinney,58 T.C. 1038 (1972), found that the parties failed to allocate a portion of the consideration to a covenant not to compete because they could not agree on an appropriate amount. The Court concluded that in this situation "the absence of the allocation *197 does not indicate that they considered the covenant to have no value." Harry A. Kinney,supra at 1043. One reason for the lack of agreement was American's lack of concern with the actual allocation of the purchase price. Petitioner, whose employment contracts were with TSI and TNLI, never performed any services for American. Consequently, American would not be entitled to a compensation expense deduction under section 162(a) (1) if any part of the purchase price had been allocated to the employment contracts. See section 1.162-7(a), Income Tax Regs.
Furthermore, the concurrent acquisition of Christian by TSI indicates that the TSI stock was worth approximately $2.75 per share. Reducing Christian's fair market value by the face value of the promissory note leaves $1,310,000 in value for the 575,000 shares of TSI, which is approximately $2.28 per share. [2]
After careful consideration of the record we are convinced that despite the final agreement, petitioner's *198 employment contracts were enforceable and valuable obligations and that respondent's allocation of $302,392 appropriately reflects the economic realities encompassing the transaction between petitioner and American. Viewing the transaction in this manner petitioner received $302,392 in consideration for the relinquishment of his employment contract rights and this amount represents ordinary income. Victor H. Heyn,39 T.C. 719 (1963). 1 Mertens, Law of Federal Income Taxation, sec. 6A.11 p. 67 (1974 Rev.). Respondent's determination with respect to this issue must be upheld. The second issue is whether the petitioner was engaged in the trade or business of farming and cattleraising entitling him to deduct those expenses incurred in connection with that activity. This question is basically factual and its resolution depends on whether petitioner's dominant motivation was to make a profit. Godfrey v. Commissioner,335 F.2d 82 (6th Cir. 1964), affirming a Memorandum Opinion of this Court; Hirsch v. Commissioner,315 F.2d 731 (9th Cir. 1963), affirming a Memorandum Opinion of this Court; section 1.162-12(a), Income Tax Regs. *199 The burden of proof is on the petitioner. Welch v. Helvering,290 U.S. 111 (1933). After closing the transaction with American petitioner purchased farm acreage and cattle, and later leased additional pasture land. Petitioner lived on the farm and in town and approximately 90 percent of his time was spent running the farm. His son also actively participated in the operation. Petitioner on his tax return for 1969 claimed various expenses, many of which the respondent does not contest in his alternative position, which appear to be the everyday expenses incurred in a farming and cattleraising activity. Petitioner also reported some income recognized from the sale of cattle during the year. Petitioner operated as a sole proprietorship throughout 1969, with the incorporation not occurring until February, 1970, and his major attempt to sell stock to the public not occurring until October, 1970. We believe petitioner has met his burden and is entitled to deduct the loss incurred in connection with this activity. Having made this threshhold determination of profitmaking intent we now must turn to respondent's alternative determination. Respondent made several adjustments *200 to petitioner's claimed loss of $57,207, finally determining that the loss should be $43,565.85. Petitioner has contested two of these adjustments. Under the terms of the lease by which petitioner acquired the use of the additional pasture land, petitioner was required to make a $15,200 rental payment in October, 1969 which covered the period from October 1, 1969 through December 31, 1970. Thereafter rental payments of $12,200 were due on January 1 of each year until the lease terminated on December 31, 1975. Respondent disallowed $12,000 of the $15,200 rental expense deducted by petitioner in 1969 determining that it was a rental expense to be incurred in 1970 and could only be deducted in that year. Petitioner argues that under the terms of the lease the $15,200 was required to be paid in 1969 and that it should be deductible in that year. However, this Court has held in University Properties, Inc.,45 T.C. 416, 421 (1966), affd. 378 F.2d 83 (9th Cir. 1967), that: It is well settled that advance rentals or the cost of acquiring a leasehold interest is *201 a capital expenditure, recoverable through amoitization over the remaining life of the lease. [Citations omitted.] Rentals may be deducted as such only for the year or years to which they are applied. If they are paid for the continued use of the property beyond the years in which paid they are not deductible in full in the year paid but must be deducted ratably over the years during which the property is so used. [Emphasis supplied.] To the same effect, Norman Baker Smith,51 T.C. 429, 440 (1968). Petitioner's reliance on analogous situations is of no help in this patchwork area of prepaid items. See Mann v. Commissioner,483 F.2d 673, 676 (8th Cir. 1973), reversing a Memorandum Opinion of this Court. Respondent's determination with respect to this issue must be upheld. In December, 1969 petitioner purchased farm equipment including a mower, baler, rake, and a stock trailergooseneck. Petitioner did not claim normal depreciation under section 167, but did claim additional first-year depreciation under section 169, in the amount of $973. Section *202 179(a) provides that: SEC. 179. ADDITIONAL FIRST-YEAR DEPRECIATION ALLOWANCE FOR SMALL BUSINESS. (a) General Rule.--In the case of section 179 property, the term "reasonable allowance" as used in section 167(a) may, at the election of the taxpayer, include an allowance, for the first taxable year for which a deduction is allowable under section 167 to the taxpayer with respect to such property, of 20 percent of the cost of such property. Under section 1.167(a)-10(b), Income Tax Regs., the period for depreciation begins when the asset is placed in service. The evidence in the record discloses that this farm equipment was purchased in mid and late December, 1969. However, there is no indication as to when this equipment was placed in service. Petitioner has not met his burden with respect to this issue and respondent's determination must be upheld. Decision will be entered under Rule 155.
Footnotes
1. All Code references are to the Internal Revenue Code of 1954, as amended.↩
2. If the face value of the note is reduced approximately $271,000 to reflect a possible fair market value, the value of the TSI shares would be increased to approximately $2.75 per share.↩